**UNITED STATES of America,
Appellee,**

v.

**David Ross MILEY et al.,
Defendants-Appellants.**

**Nos. 536–540, Docket 74–2207–10,
74–2423.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 17, 1975.

Decided March 19, 1975.

Sidney Meyers, New York City, for defendant-appellant Wenzler.

Lawrence Stern, New York City (Irving Cohen, New York City, of counsel), for defendant-appellant Goldstein.

Stephen Gillers, New York City, for defendant-appellant Flores.

Harry Fractenberg, New York City, for defendant-appellant Miley.

Laurence E. Jacobson, New York City, for defendant-appellant Varvarigos.

Harry C. Batchelder, Jr., Asst. U. S. Atty. (Paul J. Curran, U. S. Atty., Southern District of New York, and Dominic F. Amorosa and John D. Gordan, III, Asst. U. S. Attys., of counsel), for appellee.

Before WATERMAN, FRIENDLY and GURFEIN, Circuit Judges.

FRIENDLY, Circuit Judge:

In these appeals from convictions after jury trials before Judge Pollack in the District Court for the Southern District of New York for distributing and possessing with intent to distribute Schedule I and Schedule III controlled substances, to wit, lysergic acid diethylamide (LSD) and phencyclidine hydrochloride (PCP), 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(B), and for conspiring to commit these substantive crimes, 21 U.S.C. § 846, we must again deal with the consequences of the Government's ill-advised practice of attempting to obtain in a single trial convictions of numerous defendants who are only loosely connected in a criminal enterprise. Before dealing with this we must engage in a tedious summary of the relevant evidence and will consider other grounds of appeal.

## I. *The Facts.*

The indictment charged appellants, David Ross Miley, Joseph Raymond Wenzler, Marvin Thomas Goldstein, Dean Peter Varvarigos, and David Flores, and four others, William Brandt II, Robin Bachia, John Godinsky, and Jan Lang, with conspiracy knowingly to distribute and possess with intent to distribute controlled substances (Count One) and with eight substantive counts (Count Two through Nine).[1] During the early stages of an earlier trial, Brandt, Godinsky, and Bachia pleaded guilty to the conspiracy count and each also pleaded guilty to a substantive count against him. They did not testify on behalf of the Government and were subsequently sentenced, with the remaining counts dismissed against them. Lang was a fugitive during all of the trial proceedings.

At the first trial, held April 29 through May 8, 1974, the jury found Miley not guilty on Count Two and Wenzler guilty on Count Five, but was unable to reach agreement on the remaining counts, One, Three, Four, Six, Eight, and Nine. The court thereupon declared a mistrial on these counts. It also denied Wenzler's application to set aside the verdict on Count Five on the grounds that there was insufficient evidence to

---

1. The individuals charged, substances, and amounts for each of these counts were as follows:

 COUNT TWO: Brandt, Miley, and Godinsky
 (1000 dosage units of LSD—approximately 164.8 milligrams).

 COUNT THREE: Brandt, Flores, and Varvarigos
 (approximately 27.11 grams of PCP).

 COUNT FOUR: Brandt, Miley, and Godinsky
 (3850 dosage units of LSD—approximately 665087.5 micrograms).

 COUNT FIVE: Brandt, Lang, and Wenzler
 (4070 dosage units of LSD—approximately 320.26 milligrams).

 COUNT SIX: Brandt, Miley, and Bachia
 (approximately 1800 dosage units of LSD).

 COUNT SEVEN: Bachia
 (approximately 10,000 dosage units of LSD).

 COUNT EIGHT: Goldstein
 (approximately 4000 dosage units of LSD).

 COUNT NINE: Wenzler
 (approximately 295 tablets containing LSD).

sustain it and that the court had erroneously refused to charge the jury on the entrapment defense with respect to that count.

During the second trial, held June 17 through June 21, 1974, the Government introduced much the same evidence. The Government relied heavily on the testimony of Michael Starbuck, a Government informer, and of Special Agents Robert Nieves and Robert Palombo of the Drug Enforcement Administration, United States Department of Justice. Their testimony was bolstered at points by surveillance testimony. No evidence was introduced by the defendants. Starbuck was a supervisor at a marketing research company which also employed defendant Brandt in his department. According to Starbuck, in June or July of 1972, he, Brandt, and others had made an agreement to import cocaine from South America. While the effort was unsuccessful, it did not go unnoticed. In late October, 1973, Nieves and Palombo arrested Starbuck in connection with their investigation of the attempted importation. Under questioning, Starbuck admitted his participation in the cocaine conspiracy, for which he was indicted several weeks before the second trial. He agreed to assist the agents in finding the sources and other parties in the cocaine conspiracy and later in locating persons dealing in other controlled substances. During the period in which he cooperated with the agents, he received a total of $350 in expense money and the agents told him that they would bring the fact of his cooperation to the attention of the judge who would later preside at his trial. The following is a summary of the Government's evidence, taken in the most favorable light.

On November 3, 1973, Starbuck met Brandt at the latter's room at the Village Plaza Hotel to discuss a possible purchase of marijuana. The subject of LSD transactions also arose. On November 12, Starbuck, Brandt, and a third person attempted to locate a source for the sale of LSD in Woodstock but were unsuccessful. Starbuck returned to the Village Plaza Hotel on November 23 and met Brandt and Miley, who was Brandt's partner in a comic book store venture. Starbuck made arrangements to purchase some 1000 units of LSD for $650 from Brandt, who said his source was Godinsky. Starbuck received a three-unit sample of the drug, which came in the form of dots on blotter paper and which was turned over to the agents four days later. On November 27, the agents decided to make the purchase arranged by Starbuck and, after equipping him with a Kel transmitter belt, accompanied him to the Village Plaza Hotel, near which Palombo established a surveillance post and monitored a Kel receiving device. Reception was poor and the tape made of the transaction inside the Hotel is apparently almost totally inaudible. At Nieves' request, Starbuck introduced him to Brandt as a customer. Also present in Brandt's room were Miley and Godinsky. Godinsky produced ten sheets of blotter paper each bearing 100 units of LSD. Nieves handed over $650 to Brandt, who kept $180 or $200 for himself and gave Godinsky the remainder (these facts are the basis for Count Two).[2] Nieves then raised the possibility of much larger purchases of LSD at more reasonable prices. At this point Godinsky left, returned a few moments later to retrieve his knapsack, and left again. The conversation about price resumed, Brandt promising to obtain LSD in gram quantities at $1,400 a gram or $1,250 a gram for sales larger than three grams. Miley and Brandt said that the LSD was of "excellent" quality. At this point, Brandt raised the subject of selling tetrahydracannabinol (THC), a marijuana derivative, for $1,800 an ounce; Nieves told Brandt that he would purchase a quantity of this drug if his "customers" displayed an interest in it.

The next meeting at the Village Plaza occurred on December 5 and was attended by Brandt and Starbuck, who immedi-

---

**2.** Nieves testified that Brandt had told him that, whenever he dealt with Brandt, he was to give Brandt the money and Brandt would "take care of the rest."

ately drove over to the apartment of Lang, where the three made arrangements for the sale of THC at $1,800 an ounce. Lang left the room and made a call to an unidentified person; upon returning he said that the date of the transaction would as yet have to remain somewhat uncertain but he gave Starbuck a sample of the drug, which was turned over to Palombo on December 7. Under analysis, the sample was discovered to contain PCP, a horse tranquilizer, rather than THC.

During the early afternoon of December 13, Starbuck approached Nieves and said that he had arranged the purchase of one ounce of THC for $1,800 through Brandt. Starbuck was once again equipped with a Kel transmitter belt.[3] Nieves and Palombo accompanied Starbuck to the Village Plaza Hotel, where Starbuck left the car and returned with Brandt. Palombo was introduced as Nieves' "cousin Sammy." The party then left for the apartment of Flores, who was reluctant to meet strangers. Brandt and Starbuck first visited Flores' apartment without the agents, discovering that Varvarigos was also present; after being assured that the agents were trustworthy customers, Varvarigos, who was also suspicious, suggested that only one of them be allowed to enter the apartment. Starbuck thereupon returned to the car and Nieves, who left the $1,800 with Palombo, accompanied Starbuck back to Flores' apartment and was introduced to Flores and Varvarigos by Brandt. Nieves weighed the plastic bag containing the drug, ascertaining that it weighed approximately one ounce, and left to obtain the money. Upon returning, he gave the money to Brandt, who handed a portion of it to Flores with the comment "Twelve, right?" (Count Three). Nieves also solicited and received advice from Flores and Varvarigos about dosage size, mixing, and sale of the drug. When the drug was later analyzed, it was once again determined to be PCP.

Four days later, on December 17, Starbuck again visited Brandt at the Village Plaza Hotel, but the latter was busy and directed Miley to accompany Starbuck to Varvarigos' residence. Varvarigos stated that he could sell a kilogram of cocaine, but Starbuck was unwilling to buy so large a quantity. No agreement was reached, but Varvarigos gave Starbuck a sample, which was passed on to the agents.

Continuing to play their roles, Nieves and Palombo called Varvarigos on December 18 to complain that the substance they had recently purchased from him was PCP rather than THC, an allegation which Varvarigos denied. The conversation was taped and played to the jury. During the course of the conversation Varvarigos urged the agents to help him move greater quantities of the drug and brought up the subject of the cocaine sample he had given Starbuck. Preliminary arrangements were made for the sale of a pound of cocaine, but Varvarigos expressed his concern to Palombo that the transaction would involve "[w]ay too many" people; "[t]his is going through so many people. You [Palombo], Bobby [Nieves], Mike [Starbuck], Billy [Brandt], . . . David [Flores] and then to me." He also said that there was "somebody else . . . [w]ho has to be taken care of too," someone through whom he had met Brandt. On January 2 and again on January 3, Palombo called Varvarigos to firm up the details of the cocaine transaction. The price was to be $16,000. Both conversations were taped and transcripts of them were entered into evidence.

Nieves also called Brandt on January 3 and negotiated a deal for the sale of 3850 dosage units of LSD for a price of $1,925. Nieves and Palombo proceeded to Brandt's room at the Village Plaza Hotel, where they met with Brandt, Miley, and Godinsky. It seems that only 1350 dosage units were then available and that there would be a wait of an

---

**3.** It is uncertain from the testimony whether a recording was made of the subsequent conversations and, if so, what happened to the tape.

hour before the balance of 2500 dosage units would be ready for sale. Godinsky handed the first portion of LSD to the agents, who paid him $675; Godinsky said that he would return to his "source" for the rest. The agents left Brandt's room, having agreed to return in an hour. When they returned, they were admitted by Miley, who explained that Brandt was running some errands and that Godinsky would soon reappear with the rest of the LSD or at least call if his source was unable to supply him with it. Shortly thereafter, Brandt returned, reiterated Miley's comments about Godinsky's intentions, and received a telephone call, which he said was from Godinsky, who had obtained the LSD and was on his way to Brandt's room. Upon arriving, Godinsky exchanged the 2500 dosage units for $1,250 (Count Four). At this point Brandt explained that Godinsky was leaving for a vacation in California and that, because his transactions with the agents had been so successful, Brandt would now deal more directly with Godinsky's supplier and roommate, subsequently identified as Bachia, who also went by the name "Strider."

On the following day, January 4, Starbuck met Brandt at his room at the Village Plaza Hotel for the purpose of arranging an LSD transaction with a new source. The two of them proceeded to Lang's residence, where the sale of a different form of LSD called "purple haze" for $1,800 an ounce was discussed. Starbuck received a sample of the substance, which he turned over to Nieves on January 15.

During the period January 8 through January 10, Palombo and Nieves attempted to complete the cocaine transaction with Varvarigos. The agents had obtained the $16,000 which had been agreed upon but Varvarigos was unable to arrange the exchange upon terms satisfactory to the agents and the deal was aborted. Varvarigos, however, left the agents with another sample of alleged THC, which again turned out to be PCP.

When Starbuck gave Nieves and Palombo the sample "purple haze" LSD on

January 15, the agents decided to make the proposed purchase. Starbuck proceeded to Brandt's room, from which the two of them departed for Lang's residence, where they were later met by Nieves and Palombo. The agents had obtained $1,400 in Government funds to complete the purchase. Lang said that the deal could be completed but that only two persons could accompany him to his source, who lived nearby. At this point, Starbuck and Brandt departed for the latter's comic book store, where the agents were to meet them after the transaction was completed. Lang and the agents proceeded to an apartment occupied by a person introduced to them as "Joe," subsequently identified as Wenzler, and purchased from him two separate lots of "purple haze" LSD in small purple tablets, each lot containing 2000 tablets and costing $600 and each obtained by Wenzler during separate short trips from the apartment. Wenzler vouched for the quality of the merchandise and said that, if given some notice, he could obtain larger quantities. The agents then proceeded to Brandt's nearby comic book store and paid him a $200 "commission" for the transaction (Count Five). Later analysis showed that the purchased "purple haze" was identical to the sample Brandt had earlier given Starbuck.

The agents returned to the comic book store February 6 to make final arrangements for a purchase of 50,000 units of LSD for $16,500. They were met by Miley, who said that they could find Brandt at a second comic book store he was preparing for opening. Brandt informed them that a new shipment large enough to handle their order was expected in the near future but that his supplier, Strider (Bachia), was reluctant to meet purchasers prior to the day of the sale. The agents insisted that they receive the same type of LSD on blotter paper they had previously purchased from Godinsky; Brandt assured them that they would receive the same type of LSD from the same source.

The final events occurred on February 12. Agents Nieves and Palombo met

Brandt and Miley at the latters' comic book store to complete the 50,000 unit transaction.

Parts of the ensuing conversations were recorded by means of a Kel transmitter and the recordings were played to the jury. Bachia had not yet arrived and, when the agents grew restless after waiting 45 minutes, Brandt dispatched Miley to find him. Prior to departing Miley informed Nieves and Palombo that their recent purchases had enabled him and Brandt to open the second comic book store. Shortly after Miley left, Bachia appeared and, pursuant to agreed procedure, as a token of good faith the agents made a purchase of 1800 units of LSD for $660 to assuage Bachia's fear of being robbed (Count Six). Bachia insisted upon seeing the money for the 50,000 unit purchase and was permitted to examine it in the agents' car. He also insisted that it be broken down into $3,300 bundles because he wanted to handle the transaction in five separate 10,000-unit lots. The agents thereupon drove Bachia to the vicinity of the Bowery and East 4th Street, the neighborhood where he said his source lived. The agents saw him turn east on East 4th Street but then lost sight of him. Ten minutes later Special Agents Sennett and Sheehan, both officers of the Drug Enforcement Administration, observed Bachia departing from a store front apartment called Shesh Pesh at 56 East 4th Street. He returned to the agents' car with 10,000 units wrapped in aluminum foil (Count Seven) but said he was unable to produce the other 40,000 units because his source had already sold them. The agents then placed Bachia under arrest, reading him his rights. They were joined by Agent Sheehan and proceeded to the store front apartment at 56 East 4th Street, where Bachia knocked on the door and the occupant of the apartment opened it about six inches, engaging Bachia in a brief conversation. Nieves testified that he then approached the door, identified himself as a federal agent, and announced that he intended to arrest the occupant, Goldstein. Goldstein slammed the door on Nieves' arm, but the agents succeeded in forcing the door open and subduing Goldstein. Palombo had drawn his weapon before entering the apartment but he holstered it soon after entering. Nieves read Goldstein his rights and Palombo obtained his signature on a form in which Goldstein consented to the search of his apartment.[4] During the subsequent search, the agents found the $660, identified by serial number, which they had paid Bachia for the earlier "good faith" purchase of 1800 units of LSD, under a mattress, where Goldstein had previously said they would find money. The agents had noticed on the bottom shelf of a bookcase in the room a package wrapped in aluminum foil in the same fashion as the package earlier delivered by Bachia; this was later seized and was found to contain 4000 units of LSD (Count Eight).

Shortly thereafter Nieves, Palombo, and Sheehan arrested Brandt and Miley at their comic book store. Nieves and two other agents then proceeded to Wenzler's apartment, where they observed him about to open the door. Nieves called out to him, identified himself as a federal agent, and announced his intention to arrest Wenzler. Just as Nieves, who had been joined by Agent Kobell and their Drug Enforcement Administration supervisor, was about to put handcuffs on Wenzler, sounds on the steps above Wenzler's apartment sug-

---

4. There is some disagreement about what induced Goldstein to sign the consent form. The relevant portion of Palombo's testimony is as follows:

A few minutes thereafter I obtained a consent to search the premises from Mr. Goldstein. He asked me if I had a search warrant. *I told him I didn't, but that I had intended on getting one.*

He said, "Would it be possible for me to be present when you got the search warrant."

I . . . told him it would be highly unlikely because it would take a long time to obtain a search warrant from the court.

He said, "In that case, I don't want anybody searching my apartment without me being present. *I will sign the consent to search form.*" He did.

gested that other residents were about to pass the group standing in front of Wenzler's as yet unopened door. According to Nieves and Kobell, Wenzler sought to avoid the embarrassment of his neighbors observing him in handcuffs and being arrested and suggested that the party enter his apartment, where he could be handcuffed out of public view. Once inside, he was advised of his rights. Wenzler consented orally to the search of his apartment (none of the agents had a consent form with him), and during the subsequent search the agents discovered a small quantity of cocaine, six pounds of marijuana, and approximately 285 tablets of "purple haze" LSD (Count Nine—LSD only). Nieves and Kobell both denied drawing their weapons at any time during the arrest.

On the basis of this testimony and laboratory evidence about the substances seized, the jury returned verdicts of guilty on all counts. Later Judge Pollack pronounced sentence on the appellants.[5]

## II. *Wenzler's Contentions Concerning Suppression and Entrapment.*

Wenzler argues that the 285 tablets of "purple haze" LSD, the basis for his conviction on Count Nine, which were seized in his apartment on February 12, 1974, during a search conducted by agents who sought to arrest him for the drug sale of January 15 (Count Five), should have been suppressed. He argues that, while the agents may have had probable cause to arrest him outside his apartment, their entry into his apartment and search of it without a search warrant violated his rights since the search was not incident to the arrest. He continues that, even assuming he had invited the agents into his apartment, that invitation was for the very limited purpose of helping him avoid embarrassment and did not constitute permission for an incidental search. Moreover, he says, any "consent" to search was not voluntarily given but was rather the result of "psychological coercion."

These arguments were fully aired at a suppression hearing conducted by Judge Pollack on April 10 and 11, 1974, before the first trial. In an affidavit among his moving papers, Wenzler described the events of February 12 in considerably different terms than those given in the testimony of Agents Nieves and Kobell. He claimed that four individuals in "street clothes," all displaying weapons, confronted him in front of his apartment door, leading him to believe that he was being held up. The four individuals did not identify themselves for a time and forced him to give them his keys. Forcibly restraining Wenzler, they entered and ransacked his apartment, threatening him with bodily harm in an effort to

---

**5.** Miley was sentenced to concurrent terms of two months for Counts Four and Six. Pursuant to 21 U.S.C. § 841(b)(1)(B), he was also given special parole for a term of two years to commence upon completion of the term of confinement. Imposition of sentence on Count One was suspended and Miley was placed on probation for a period of two years, to run concurrently with his special parole. Miley has served his term of confinement.

Wenzler was sentenced to concurrent terms of four months on Counts Five and Nine, to be followed by two years special parole pursuant to 21 U.S.C. § 841(b)(1)(B). Imposition of sentence on Count One was suspended and Wenzler was placed on probation for two years to run concurrently with the special parole, with special conditions.

Goldstein was sentenced to concurrent terms of six months for Counts One and Eight and pursuant to 21 U.S.C. § 841(b)(1)(B) was placed on special parole for a period of two years commencing upon completion of the term of confinement.

Varvarigos was sentenced to a term of confinement of three months on Count Three and was also placed on special parole for two years commencing upon completion of confinement pursuant to 21 U.S.C. § 841(b)(1)(B). Imposition of sentence on Count One was suspended and Varvarigos was placed on probation for a term of two years to run concurrently with the term of special parole.

Flores was committed to concurrent terms on Counts One and Three of the maximum sentence authorized by law pursuant to 18 U.S.C. § 4208(b) pending completion by the Bureau of Prisons of a neurological, psychiatric, and psychological study, 18 U.S.C. § 4208(c), after which Flores is to be returned to court for modification of sentence.

All appellants except Miley were continued on bail pending this appeal.

obtain from him the location of any drugs in the premises. After obtaining the 285 tablets containing LSD, the four individuals informed Wenzler -for the first time that he was under arrest.

In testimony at the suppression hearing, however, Wenzler told a different version of this event. He said that the four individuals first placed him under arrest and then took his keys. When other persons seemed to be descending the stairs, he asked the agents to "hide the incident," presumably by surrounding him, but they instead opened his door and shoved him inside, where they verbally harassed him and ransacked his apartment. They did not inform him of his rights and he did not consent to any search. Under cross-examination and questioning by the court, however, Wenzler acknowledged that he was a college graduate and was aware of his *Miranda* rights as a matter of general knowledge, that he really did not see any guns, that he had not read very closely the lurid affidavit he had signed, that after his arraignment he had failed to tell the Assistant United States Attorney who had interviewed him that he had been assaulted and his apartment ransacked, and that he knew that the tablets removed from his nightstand contained LSD.

Noting the discrepancies between Wenzler's testimony and the statements in his affidavit in support of his suppression motion, Judge Pollack found Wenzler's version of the events of that day "not worthy of belief." He found, after "due deliberation" and "based upon the evidence, including the demeanor evidence," that Wenzler was arrested on probable cause, that he invited the agents to enter his apartment, and that he consented to the search.[6]

We find no merit in Wenzler's argument on this point. It is clear that a warrantless search is constitutionally permissible if there is consent, Katz v. United States, 389 U.S. 347, 358 & n. 22, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); Vale v. Louisiana, 399 U.S. 30, 35, 90 S.Ct. 1969, 26 L.Ed.2d 409 (1970), though the Government must sustain its burden of proving that the consent was obtained freely and voluntarily. Bumper v. North Carolina, 391 U.S. 543, 548, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). The Government need only satisfy the district judge by a preponderance of evidence that the defendant freely and voluntarily gave his consent to the search, see Lego v. Twomey, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972), and the credibility of the witnesses is a question for the judge who heard them. United States v. Fernandez, 456 F.2d 638, 640 (2 Cir. 1972); United States v. Faruolo, 506 F.2d 490, 493 (2 Cir. 1974). Judge Pollack clearly "[c]onsider[ed] the totality of the circumstances" in determining that consent was voluntary and knowing, United States v. Mapp, 476 F.2d 67, 78 (2 Cir. 1972); see Schneckloth v. Bustamonte, 412 U.S. 218, 248–49, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973); United States v. Faruolo, *supra,* 506 F.2d at 493, and we are unwilling to overturn his ruling, which is on "a question of fact to be determined from all the circumstances." Schneckloth v. Bustamonte, *supra,* 412 U.S. at 248–49, 93 S.Ct. at 2059. And we reject Wenzler's

---

**6.** More specifically, Judge Pollack found:

The agents were lawfully on the premises, having been invited to enter therein by the defendant Wenzler, who voluntarily led the agents to the place where the drugs were located in the apartment, pointing out the night table which he voluntarily consented could be searched by the agents, and their search yielded the contraband.

The consent that was given for the search was given by a 26, now a 27-year old college-educated person possessing an evident consciousness, intelligent understanding of the circumstances on the occasion in question and of what he was doing.

And that consent was freely, if not rather casually given without coercion either by explicit or implicit means, and was not generated through implied threat or covert force, nor was there any involuntary submission to authority. There is no credible evidence of any inherently coercive tactics.

The agents' testimony that they read to this defendant and explained his *Miranda* rights and that he knew all about them, that he stated that he knew all about them seems vindicated by the evidence on this hearing.

seeming assertion that the mere fact of arrest precludes a finding of the voluntariness of consent to search. See United States v. Candella, 469 F.2d 173, 175 (2 Cir. 1972); United States ex rel. Lundergan v. McMann, 417 F.2d 519, 521 (2 Cir. 1969). Indeed, this seems to be a typical case of a knowledgeable suspect extending consent to officers under circumstances where they could readily have obtained a search warrant and then attempting to have the evidence suppressed on the ground that the consent was not voluntary. See People v. Michael, 45 Cal.2d 751, 754, 290 P.2d 852, 854 (1955) (Traynor, J.), quoted with approval in Schneckloth v. Bustamonte, *supra,* 412 U.S. at 230–31, 93 S.Ct. 2041.

Wenzler's second major contention is that his conviction on Count Five in the first trial must be reversed because Judge Pollack refused to give the jury a charge on entrapment. Counsel had sought to take the two factual questions of inducement and predisposition, which comprise the test for the entrapment defense in this circuit, see United States v. Sherman, 200 F.2d 880, 882 (2 Cir. 1952) (L. Hand, J.), before the jury. Judge Pollack denied this application and all other attempts to inject this question into the trial because:

> [o]n the issue of entrapment, the evidence of propensity is uncontradicted, and there is nothing in the record . . . which would authorize the

submission of any such suggestion to the jury. . . . [E]ntrapment is not a matter of evidence in this record but in the semantic contentions of counsel . . . ..

██ We agree that the evidence of predisposition was uncontradicted. Wenzler was clearly "ready and willing without persuasion and was . . . awaiting any propitious opportunity to commit the offence." United States v. Sherman, *supra,* 200 F.2d at 882.[7] The only caution exhibited by Wenzler was in avoiding the chance that the agents might try to take his LSD without paying for it. He was, however, fully prepared to complete the transaction on the very first occasion he met Nieves and Palombo. The short answer to Wenzler's contention is that even if we should assume there was sufficient evidence of inducement, but see United States v. Berry, 362 F.2d 756, 758 (2 Cir. 1966), when, as here, the evidence of propensity was uncontradicted, it was not error to refuse to put the entrapment defense to the jury. United States v. McMillan, 368 F.2d 810, 812 (2 Cir. 1966), cert. denied, 386 U.S. 909, 87 S.Ct. 856, 17 L.Ed.2d 783 (1967), and cases there cited; United States v. Greenberg, 444 F.2d 369, 371–72 (2 Cir.), cert. denied, 404 U.S. 853, 92 S.Ct. 93, 30 L.Ed.2d 93 (1971); United States v. Nieves, 451 F.2d 836, 838 (2 Cir. 1971).[8]

7. Judge Pollack observed:

> Well, if there was any one count in this indictment that does not even bear the semblance of an inference of entrapment, it was count five. That was a hand to hand transaction in an enormous amount of LSD, which [Wenzler] negotiated directly with the agents. And if that doesn't show a predisposition and a clear indication of being a narcotics seller, I don't know what case will show it.

8. We recognize, as we have before, that this circuit's approach to the entrapment defense has been criticized, see Kadis v. United States, 373 F.2d 370, 373 n. 4 (1 Cir. 1967). While we adhere to our practice of examining inducement and predisposition as two separate questions, we believe the outcome here would be the same under the *Kadis* approach. The court in *Kadis* announced that:

> [h]enceforth we will look, singly, at the ultimate question of entrapment. If the defend-

ant shows, through government witnesses or otherwise, some indication that a government agent corrupted him, the burden of disproving entrapment will be on the government; *but such a showing is not made simply by evidence of a solicitation. There must be some evidence tending to show unreadiness.*

Id. at 374 (emphasis added). In explaining its reasoning in *Kadis,* the First Circuit has said that "we held that a defendant must produce some evidence of his own unreadiness to commit a criminal offense before the prosecution incurs a burden of disproving entrapment." United States v. Foster, 469 F.2d 1, 3 (1 Cir. 1972). Such statements accord with the broader understanding of the "relatively limited defense" of entrapment, United States v. Russell, 411 U.S. 423, 435, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), "that the fact that officers or employees of the Government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecu-

### III. Goldstein's Suppression and Other Arguments.

Goldstein mounts a number of attacks upon the validity of the admission of the 4000 units of LSD seized during his arrest on February 12, 1974, and the evidence of the discovery of the $660 in identified bills which had been paid to Bachia. He argues on appeal that the agents burst into his apartment, scuffled with and handcuffed him, and searched the apartment without any warrant; that the consent form he signed was obtained involuntarily because of the overwhelming display of guns and application of physical compulsion and because of the impression given him by the agents that their obtaining a warrant for a search was a mere formality; and that the LSD was therefore illegally seized. He also argues that, even if the consent was voluntary, the search was nevertheless illegal because it was made in connection with an arrest for which there was no probable cause and because there was in any event no probable cause to believe that LSD would be found in the premises. Finally, he says that, even if there was probable cause to make the arrest, the arrest was completed at the door in a vestibule created by the erection of a partition, measuring three feet by five feet, which concealed the rest of the apartment from "plain view." Taking Goldstein into the rest of the apartment thus amounted to entering another room for purposes of a search incident to an arrest.

Goldstein's arguments were also aired at a suppression hearing, held the morning before the first trial commenced. Goldstein did not testify at the hearing, but in his moving papers he said that he had been pushed into his apartment by a number of men "with firearms" who did not produce a warrant upon request and who began immediately searching the premises, discovering a quantity of LSD

some half hour later. At some point "long after they commenced their search" Goldstein was given a consent form, which he signed involuntarily in "anxiety and fright, especially upon seeing the weapons."

The only two witnesses testifying at the suppression hearing, Agents Nieves and Sheehan, who had participated in the arrest, recounted versions at substantial variance with that given by Goldstein in his papers. Nieves testified that Bachia, upon being arrested after selling Palombo and Nieves 10,000 units of LSD, agreed to cooperate in the agents' efforts to arrest his supplier, whom he described, whose address he gave, and to whose apartment he took the agents. When an individual fitting the description Bachia gave opened the door of the apartment, Nieves identified himself, announced that the occupant was under arrest, and, with the assistance of other agents who had joined him, gained entry and subdued Goldstein, who resisted them. While Nieves and Sheehan had noticed a packet wrapped in aluminum foil (seemingly identical to the packet just given to Nieves by Bachia) on a shelf soon after entering the apartment, no effort was made to seize it or conduct a search until Goldstein had been read his rights and had executed a consent to search form. Nieves denied ever drawing his weapon and said that Goldstein's main objection to any search of the apartment was that he would not be present. Nieves assured him that he could be present. In describing the small apartment under cross-examination, Nieves declined to accede to the suggestion that the partition by the door had the effect of creating another small room in what was in any event a small store front converted into an apartment. He acknowledged that a "cursory search" had been made of the apartment

tion." *Id.*, quoting Sorrels v. United States, 287 U.S. 435, 441, 53 S.Ct. 210, 212, 77 L.Ed. 413 (1932). See Sherman v. United States,

356 U.S. 369, 372, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958).

before the consent form was signed, but said this was made for the purpose of determining whether any other persons were within the premises. Sheehan corroborated Nieves' testimony in important respects. He had been conducting surveillance on February 12 and had observed Bachia depart from the apartment where Goldstein was later arrested. He said that he saw neither Nieves nor Palombo, who were the first to approach the door of the apartment, draw their weapons. The only time he drew his weapon was when he searched a curtained area at the rear of the apartment. He also characterized the apartment as consisting of a single room. The Government acknowledged that the testimony of a third witness would reveal that he had drawn his weapon but only while he was entering the apartment.

Judge Pollack denied the motion to suppress in all respects, finding:

> It has been clearly and convincingly shown that there was ample probable cause for an arrest, and the consent to search given by the defendant Goldstein was, in fact, voluntarily given, and the search was reasonably conducted within permissible areas and was not the result of duress or coercion, express or implied, or beyond the reasonable limits of a proper search.

 The combination of Bachia's possession of the 10,000 units of LSD in the vicinity of Goldstein's apartment; his statement that his supplier, whom he knew as "Mel," lived at 56 East 4th Street, from which address Bachia had just been seen leaving; the accuracy of his description of Goldstein; and Goldstein's act in slamming the door on Nieves' arm, see 18 U.S.C. § 111, clearly provided probable cause for arrest. Goldstein's contrary suggestion that on the basis of his reports Bachia was not demonstrated to have been a reliable informant is wholly unpersuasive. Apart from the fact that Bachia's statements were amply corroborated, see United States v. Manning, 448 F.2d 992, 997–1000 (2 Cir.) (en banc), cert. denied, 404 U.S. 995, 92 S.Ct. 541, 30 L.Ed.2d 548 (1971), he was no informant in the usual sense but was a confessed participant in the very crime for which Goldstein was arrested. To require a showing of previous reliability by such a person would, as in the case of a victim or a witness, see Wisconsin v. Paszek, 50 Wis.2d 619, 184 N.W.2d 836 (1971), make his information totally unavailable, despite the peculiar likelihood of its accuracy. Such information is *toto coelo* removed from a "meager report" that "could easily have been obtained from an offhand remark heard at a neighborhood bar", as to which prior history of providing accurate information is required, Spinelli v. United States, 393 U.S. 410, 417, 89 S.Ct. 584, 589, 21 L.Ed.2d 637 (1969).

 This might make it unnecessary to go further if the agents had seized only the package wrapped in aluminum foil, despite the uncertainties concerning the "plain view" doctrine engendered by Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971). However, under Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), the existence of probable cause for arrest would not justify the search of the mattress which resulted in discovery of the bills paid to Bachia. On this the Government's case must rest upon the court's finding of consent. Here again we should not lightly overturn Judge Pollack's finding that Goldstein's written consent, executed after he was orally advised of his rights and on a form which specifically apprised him that he did not have to consent to the search, was voluntary. While Goldstein suggested that a show of force played an important part in inducing him to sign the consent form, Judge Pollack chose to believe the live testimony of the agents at the suppression hearing that weapons were drawn by a few agents only as a precaution during entry of the apartment, and it was his function to weigh credibility. United States v. Fernandez, *supra,* 456 F.2d at 640. Goldstein's contention that

he signed the consent form only after the agents led him to believe that obtaining a search warrant was a mere formality, even if true, would not advance his cause, since any such suggestion in this case would have been wholly accurate; there was clearly sufficient evidence here to justify issuance of a warrant and for that matter to predict its issuance with confidence, see United States ex rel. Gockley v. Myers, 378 F.2d 398 (3 Cir. 1967) (Hastie, J.); Hamilton v. North Carolina, 260 F.Supp. 632 (E.D. N.C.1966); but see United States v. Boukater, 409 F.2d 537, 538 (5 Cir. 1969) (dictum). Moreover, we can find nothing in the testimony at the suppression hearing or during trial to suggest that any of the agents did tell Goldstein that he might as well sign the consent form since obtaining a search warrant was a "mere formality." To be sure, Palombo testified that, when Goldstein asked him if he had a search warrant, he replied that he did not but that he intended to obtain one.[9] Clearly this is not the coercive type of statement which may vitiate the validity of consent. See United States v. Bracer, 342 F.2d 522, 524–25 (2 Cir.) cert. denied, 382 U.S. 954, 86 S.Ct. 427, 15 L.Ed.2d 359 (1965); United States v. Faruolo, *supra,* 506 F.2d at 493–95 and cases cited in n. 6; United States v. Kohn, 365 F.Supp. 1031, 1034 (E.D.N.Y.1973), aff'd on the opinion below, 495 F.2d 763 (2 Cir. 1974). We therefore agree that Goldstein's consent was voluntary and that the evidence obtained during the search was admissible.

■ Goldstein also contends that he was denied a fair trial because the district judge "took on the role of the prosecutor and, in two crucial instances, elicited and highlighted the most arguably damaging evidence against" Goldstein. The claim takes on an aura of unreality when it is realized that the two isolated incidents took up less than two pages in a transcript of more than 750. In these two instances, the district judge elicited answers from Nieves about certain features of Goldstein's apartment and from Palombo about the 1800-unit LSD transaction which occurred on February 12 and the amount and location of the $660 in serialized currency found in Goldstein's apartment. Goldstein suggests that the former line of questioning sought to fix in the jury's mind that the apartment in which Goldstein was arrested was in fact his and his alone; our reading of the passage leads us to believe that it was equivocal on this point. With respect to the latter line of questioning, Goldstein suggests that the district judge's explanation of it—clarifying certain details—was "surprising" since these details had been brought out on a number of previous occasions. Rejecting out of hand any suggestion that Judge Pollack's explanation was disingenuous, we find his questioning to have been an unexceptionable effort "to clarify testimony and assist the jury in understanding the evidence," United States v. Tyminski, 418 F.2d 1060, 1062 (2 Cir. 1969), cert. denied, 397 U.S. 1075, 90 S.Ct. 1523, 25 L.Ed.2d 810 (1970).

## IV. *Single Conspiracy.*

We now reach, at long last, the principal, and disturbing, issue on these appeals. All the appellants urge vigorously that the Government failed to establish

---

**9.** Goldstein argues that he was misled into believing that refusal to consent might prevent his being present if a search warrant was obtained and a search made pursuant to it. The closest approach to factual support of this is Palombo's testimony, quoted in note 4 *supra,* which scarcely says this. However, even if one of the agents had suggested that Goldstein might not be present during a later search pursuant to a search warrant, it is by no means clear that such a statement would be misleading. Issuance of the search warrant might precede arraignment. Moreover, Goldstein, who had resisted the arresting officers, for a period of about five minutes, according to one of them, was hardly a sure candidate for immediate bail; even absent this it would have been a matter of the magistrate's discretion whether to allow him to return to his apartment to witness the search.

the existence of a single conspiracy beyond a reasonable doubt but proved at most a series of smaller conspiracies, that the conspiracy count should not have gone to the jury, and that motions for severance of the substantive counts should have been granted.

In a memorandum in opposition to defense counsels' motion to dismiss the indictment on a theory of multiple conspiracies, submitted at the first trial, the Government took the position that the following diagram portrayed the roles of the parties in the alleged conspiracy.

 Our summary of the evidence shows that it afforded a sufficient basis for the jury to be satisfied beyond a reasonable doubt that Brandt and Miley were engaged in a conspiracy with Goldstein, Bachia, and Godinsky, and also that Brandt and Miley were engaged in a conspiracy with Lang, Wenzler, Flores, and Vavarigos. But there was no evidence specifically linking the persons in the left branch of the Government's diagram with those in the two right branches.

 We are committed to the view, of which United States v. Agueci, 310 F.2d 817 (2 Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963), is a typical expression, that in the " 'chain' conspiracy, so familiar in other narcotics cases," which "is dictated by a division of labor at the various functional levels"—exportation from a source outside the country, importation, adulteration and packaging, distribution to middlemen, and street sale—the Government is not required to show that persons at one level had dealings beyond those at the next. *Id.* at 826. As was there said:

it was enough to make [certain appellants] members of the overall conspiracy that the success of their "independent" venture [adulterating and selling narcotics] was wholly dependent upon the success of the entire "chain."
. . . An individual associating himself with a "chain" conspiracy knows that it has a "scope" and that for its success it requires an organization wider than may be disclosed by his personal participation.

*Id.* at 826–27.

In United States v. Borelli, 336 F.2d 376, 383 (2 Cir. 1964), cert. denied sub nom. Cinquegrano v. United States, 379 U.S. 960, 85 S.Ct. 647, 13 L.Ed.2d 555 (1965), a case where the Government claimed that a single narcotics conspiracy, with many changes of personnel, had lasted for nine years, while in no way questioning what had been held in *Agueci* and many other cases, we called attention to one flaw in the "chain" metaphor. As we there said:

this simple picture tends to obscure that the links at either end are likely to consist of a number of persons who may have no reason to know that others are performing a role similar to theirs—in other words the extreme links of a chain conspiracy may have elements of the spoke conspiracy.

We suggested in a footnote, *id.* at 383 n. 2, that in such event there would be more than one conspiracy unless the evidence of the scale of the operation permitted the inference that the persons at a particular level must have known that others were performing similar roles. We have applied that principle to uphold single conspiracy convictions in many cases, of which it is sufficient to cite United States v. Bynum, 485 F.2d 490, 495–97 (2 Cir. 1973), vacated and remanded on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974); United States v. Arroyo, 494 F.2d 1316, 1318–19 (2 Cir.), cert. denied, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974); and United States v. Sperling, 506 F.2d 1323, 1340–43 (2 Cir. 1974).[10] See also United States v. Tramunti, 513 F.2d 1087 at 1106 (2 Cir. 1975).

■ While questioning the validity of at least some of our decisions, appellants predicate their main attack on the ground that the value and quantity of drugs here proved to have been sold were of nothing like the scale established in previous cases where we upheld single conspiracy convictions of persons on the same functional level of the organization despite the absence of specific evidence of agreement among them. We are inclined to agree. The operations centered about Brandt and Miley could scarcely be attributed to any real organization, even a "loose-knit" one. United States v. Bynum, *supra,* 485 F.2d at 495. In this case we cannot say, as we did in *Bynum, supra, id.* at 497 that "the infer-

ence was justified that each [supplier] knew his supplies were only a small part of the raw drugs which the extensive . . . operation processed and sold;" there was no sufficient evidence to show that Brandt and Miley, the only point of contact between the two conspiracies, were conducting what could seriously be called "a regular business on a steady basis." *Id.* The scope of this operation was defined only by Brandt's resourcefulness in securing new sources of controlled substances; but his known activities were not of such a scale that the defendants on the left of the Government's diagram must have known of the involvement of persons such as those on the right, or *vice versa.* There thus appears to have been a variance between the offense charged in the indictment and the proof adduced.

■ This, however, does not automatically require reversal. Where the indictment charges one conspiracy but the proof shows more than one, a variance is not necessarily fatal. "The true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).[11] See United States v. Aqueci, *supra,* 310 F.2d at 827; United States v. Vega, 458 F.2d 1234, 1236 (2 Cir. 1972), cert. denied sub nom. Guridi v. United States, 410 U.S. 982, 93 S.Ct. 1506, 36 L.Ed.2d 177 (1973); United States v. Calabro, 467 F.2d 973, 983 (2

10. In that case we took occasion to caution the Government that it might be unnecessarily exposing itself to reversal by continuing the indictment format reflected in this case. We said, in language strongly applicable here:

> While it is obviously impractical and inefficient for the government to try conspiracy cases one defendant at a time, it has become all too common for the government to bring indictments against a dozen or more defendants and endeavor to force as many of them as possible to trial in the same proceeding on the claim of a single conspiracy when the criminal acts could be more reasonably regarded as two or more conspiracies, perhaps with a link at the top.

United States v. Sperling, *supra,* 506 F.2d at 1340–41. Of course, the Government had not received that warning when the instant indictment was brought or even when the trials were held.

11. Counsel for Flores prefers to deal with this as a matter of misjoinder rather than variance and there is authority for his position. See 8 Moore, Federal Practice Par. 8.06[4] (1975). It is sufficient to note at this point that little difference in the outcome is to be found in the distinction. The test is whether "prejudice resulted from the joint trial." Schaffer v. United States, 362 U.S. 511, 513, 80 S.Ct. 945, 947, 4 L.Ed.2d 921 (1960). We treat the misjoinder question in greater detail below.

Cir. 1972), cert. denied, 410 U.S. 926, 93 S.Ct. 1357, 35 L.Ed.2d 587 (1973), reh. denied, 411 U.S. 941, 93 S.Ct. 1891, 36 L.Ed.2d 404 (1973); Fed.R.Crim.P. 52(a); 8A Moore, Federal Practice Par. 52.03[2], at 52–12 (1975). While the briefs and arguments contain many conclusory statements about the prejudice suffered by appellants, particularly with respect to the alleged admission of hearsay statements by persons in a separate conspiracy, neither our inquiries from the bench nor our examination of the transcript have disclosed any hearsay emanating from a member of one of the conspiracies that was used to the detriment of a member of another.[12]

▮▮▮▮▮ Appellants also assert that they were prejudiced by the reading of the *Pinkerton* charge, Pinkerton v. United States, 328 U.S. 640, 645, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946), which permits a jury to find a defendant guilty on a substantive count without specific evidence that he committed the act charged if it is clear that the offense had been committed, that it had been committed in the furtherance of an unlawful conspiracy, and that the defendant was a member of that conspiracy. As appellants point out, we recently cautioned against giving the charge as a matter of course in United States v. Sperling, *supra,* 506 F.2d at 1341–42. Apart from the lack of specific objection to this charge, as distinguished from the general objection to the single conspiracy theory, and the consequent question whether the point is available on appeal under F.R.Crim.P. 30, the reason why the *Pinkerton* charge was inappropriate as to many defendants in *Sperling*—that in effect it was the conspiracy that in some instances must be inferred largely from the series of criminal offenses committed—is much less applicable here.[13] Furthermore, our warning on *Sperling* about overuse of this charge was not given until after this trial was held. Finally, we the substantive counts were procured by the *Pinkerton* charge. While the Government requested the charge, its case with respect to the substantive counts did not stress an agency theory. The individuals charged actually possessed the drugs, were present when the transaction occurred and were seemingly active participants in it, or, as in Goldstein's case, were arrested under circumstances which suggest that the drugs

12. We also reject Goldstein's argument that there was insufficient non-hearsay evidence of his membership in a conspiracy to distribute LSD to permit admission of any hearsay statements of others, particularly Bachia, about his acts. In permitting the admission of the hearsay utterances of co-conspirators, the trial judge must be assured that "the prosecution has proved participation in the conspiracy, by the defendant against whom the hearsay is offered, by a fair preponderance of the evidence independent of the hearsay utterances." United States v. Geaney, 417 F.2d 1116, 1120 (2 Cir. 1969), cert. denied sub nom. Lynch v. United States, 397 U.S. 1028, 90 S.Ct. 1276, 25 L.Ed.2d 539 (1970). See United States v. Cirillo, 499 F.2d 872, 886 (2 Cir. 1974), cert. denied, 419 U.S. 1056, 95 S.Ct. 638, 42 L.Ed.2d 653 (1974). By Goldstein's own account, there is at least the following:

(1) Bachia frequented the vicinity of the apartment in which Goldstein was arrested during the period of the conspiracy.
(2) Bachia was seen leaving that apartment shortly before he was arrested after giving the agents the aluminum foil-wrapped, 10,-000-unit lot of LSD.

(3) The serialized money ($660) previously given by the agents to Bachia as consideration for a "good faith" purchase of a smaller quantity of LSD was discovered under the mattress of the bed in the apartment.
(4) Goldstein directed the agents to that money.
(5) Additional LSD, also wrapped in aluminum foil, was discovered in the apartment.
To this we can add that one of the agents testified that Goldstein had said that he lived in the apartment. While no one of these items might suffice to show Goldstein's participation in a conspiracy with Bachia and others, "pieces of evidence must be viewed not in isolation but in conjunction," United States v. Geaney, *supra,* 417 F.2d at 1121.

13. We cannot agree with Goldstein's assertion that "if his participation in the conspiracy was to be inferred, it was to be inferred 'back' from the evidence on the substantive count," Count Eight. The other items of evidence which are set out in note 12, *supra,* and the hearsay statements of Bachia and other co-conspirators were ample to demonstrate that he was conspiring with Bachia, Godinsky, Brandt, and Miley in an effort to sell LSD.

found in the premises were in fact his. While the *Pinkerton* charge was thus unnecessary, it was not prejudicial.[14]

The only remaining claim of prejudice is that the trial of one set of conspirators had a spill-over effect on the others, an effect which could have been avoided in separate trials. However, this was not a case where a minor participant in one conspiracy was forced to sit through weeks of damaging evidence relating to another. The whole trial consumed but five days and the crimes of the various appellants were not markedly different. Nor do we have a case in which, for instance, 36 persons in eight separate conspiracies were prosecuted in a trial in which one defendant could be swept along with the others, where "[t]he dangers of transference of guilt from one to another across the line separating conspiracies, subconscious or otherwise, are so great that no one really can say prejudice to substantial right has not taken place." *Kotteakos v. United States,* 328 U.S. 750, 774, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946). Nine persons were indicted, five tried, and there were at most three, or, as the jury could permissibly find, only two conspiracies. We find no prejudice here.

■ What has nevertheless given us particular pause is this: In the typical case, when severance motions are made at the beginning of trial, the judge and even the prosecutor may not be certain whether the evidence will support a single conspiracy charge. By the time the evidence has been given, however, a good deal of effort has been invested and the district judge is properly reluctant to grant such motions at that time, especially since the jury might moot the question by acquitting. See 8 Moore, *supra,* Par. 8.06[3], at 8–41. Appellate courts are similarly reluctant to overturn convictions for denial of motions for severance absent a showing of serious prej-

udice. Cf. *id.* Par. 8.06[2]. Here, however, there was a prior trial, in which the jury was unable to agree that the appellants were members of a single conspiracy and defense counsel on several occasions had called the court's attention to the fact that it was doubtful that the evidence could support a finding of one. When counsel renewed their motions for severance, Fed.R.Crim.P. 14, at the beginning of the second trial, the court was aware of the nature of the Government's case. Whatever reluctance it may have had to grant such or related motions after the evidence was in at the end of the first trial, "[w]hen the case is to be retried in any event this reluctance is in no way involved . . ." 8 Moore, *supra,* Par. 8.06[3], at 8–41. These motions were made as the very first order of business before opening statements. We think that, in the circumstances of a second trial, the court should at least have asked the Government to make some preliminary showing that it could produce additional evidence tending to show participation by all in a single conspiracy.

■ Absent the conspiracy count, we doubt that the joinder requirements of Fed.R.Crim.P. 8(b) could be met, since not all the appellants were otherwise "alleged to have participated in the *same* act or transaction or in the *same* series of acts or transactions constituting an offense or offenses" (emphasis supplied). See *United States v. Granello,* 365 F.2d 990, 993–94 (2 Cir. 1966), cert. denied, 386 U.S. 1019, 87 S.Ct. 1367, 18 L.Ed.2d 458 (1967), reh. denied, 387 U.S. 949, 87 S.Ct. 2072, 18 L.Ed.2d 1340 (1967); 8 Moore, *supra,* Par. 8.06[2], at 8–34 through 8–35 (examples VIII & IX). However, at the time the motions were made, joinder was proper because of the conspiracy count, and on appeal we need only determine if the court below abused its discretion in denying the Rule 14 motions. While

---

**14.** We also reject Goldstein's other objections to the charge. He seizes upon isolated parts of it and suggests that, for instance, the charge would permit the jury to find participation in a conspiracy on the basis of an individual de-

fendant's mere knowledge of it. The sentence to which he calls our attention is taken out of context. Read as a whole, the charge on membership in a conspiracy is unexceptionable.

there are persuasive arguments why the rule of Schaffer v. United States, *supra,* 362 U.S. 511, 80 S.Ct. 945, 4 L.Ed.2d 921, should not apply in instances where there is to be a retrial, 8 Moore, *supra,* Par. 8.06[3], at 8–41 through 8–42, the case law in this circuit is to the contrary. Application of Gottesman, 332 F.2d 975 (2 Cir. 1964). See United States v. Granello, *supra,* 365 F.2d at 994; United States v. Catino, 403 F.2d 491, 495 n. 2 (2 Cir. 1968), cert. denied sub nom. Pagano v. United States, 394 U.S. 1003, 89 S.Ct. 1598, 22 L.Ed.2d 780 (1969). Accordingly, since we have been unable to discern any prejudice from the joinder, we are unwilling to reverse because of denial of the motions for severance, as we surely would under the circumstances of this case if any prejudice had been shown. We trust that heed by prosecutors in this circuit to our observations in United States v. Sperling, *supra,* 506 F.2d at 1340–41, will prevent such vexing problems from arising in the future.

Affirmed.