**UNITED STATES of America,**
Appellee,

v.

**Jesus GONZALEZ–CARTA and Ceferino Perez-Carril, Defendant-Appellants.**

**Nos. 132, 133, Dockets 32318, 32668.**

United States Court of Appeals
Second Circuit.

Argued Dec. 2, 1968.

Decided March 17, 1969.

Jack Kaplan, Asst. U. S. Atty., Southern District of New York (Robert M. Morgenthau, U. S. Atty., and Daniel J. Sullivan and Douglas S. Liebhafsky, Asst. U. S. Attys., Southern District of New York, on the brief), for appellee.

Irving B. Singer, Irving Levine, Brooklyn, N. Y., for defendant-appellant Jesus Gonzalez-Carta (David T. Berman, Selden, N. Y., of counsel).

Albert J. Krieger, New York, N. Y., for defendant-appellant Ceferino Perez-Carril.

Before LUMBARD, Chief Judge, FRIENDLY, Circuit Judge and RYAN, District Judge.*

RYAN, District Judge:

Defendants appeal from judgments of conviction for conspiracy to violate and for violation of the currency laws of the United States (Sections 371, 472 and 473, Title 18, U.S.C.).

* For the Southern District of New York, sitting by designation.

Both appellants, along with a co-defendant Cepero, were convicted of conspiracy to counterfeit one million dollars in United States currency (Count I); and with two other defendants, Castanera and Castro, who did not stand trial, of unlawful possession of $304,000 counterfeit United States currency (Count VI). Appellant Carta, with Castanera and Castro, was also convicted of unlawfully selling $100,000 counterfeit United States currency (Count II).

Cepero, who was given a suspended sentence, has not appealed. Appellant Carta received a five year prison sentence and a ten year suspended sentence; and appellant Carril received a three year prison sentence and an eight year suspended sentence.

The principal error urged by Carril on the appeal is that the trial judge failed to charge that the Grand Jury testimony of Government witnesses might be considered as affirmative evidence and not merely as prior inconsistent statements impeaching their trial testimony. Additionally, Carril contends that he was prejudiced by the receipt of evidence not properly admissible against him, in that multiple conspiracies were proved.

Appellant Carta argues as a sole ground for reversal that the trial evidence is insufficient as a matter of law to sustain his conviction on any of the three counts—the conspiracy, the unlawful sale or the possession of counterfeit United States currency on which he was sentenced.

■ The record establishes that the evidence was more than adequate. The Government's proof came principally from two witnesses—Castanera and Castro.

Castanera, a printer, and Carril, a former Cuban Government official, had been associated with a defunct newspaper, El Mundo Americano; with equipment from this newspaper, they had gone into the photo offset business. Carta, a former Cuban Government official, was a friend of Carril and joined with Castanera and Carril to discuss the possibility of going into the business of printing counterfeit Dominican Republic pesos. Castanera was to do the printing; he priced the cost of a printing press and Carta gave him $350.00 toward its purchase. At this point, Carta informed one Castro, a mutual friend of appellants, of the plan and later introduced him to Castanera. It was contemplated that Castro was to replace Carril, for Carta was beginning to have doubts as to Carril's reliability. Castanera reported to Carril that he was not interested in continuing to work on the photo offset business and Carril told Castanera that he could take the equipment, which Carril had paid for and which was worth $1500, to Castanera's home. When the counterfeiting of the Dominican Republic pesos proved unsuccessful, the three—Castanera, Carta and Castro —agreed to counterfeit United States dollars. They told Carril that they intended to raise money for Cuba and asked Carril for financial backing, which he agreed to provide, but he was apparently never called upon to do so. Castanera was not to know that Carril was involved. With the printing press purchased by Carta and the other equipment donated by Carril, Castanera manufactured two editions of counterfeit $20, $50 and $100 bills and one edition of $20 counterfeit bills—aggregating $840,000; and gave them to Carta and Castro, who sold them to Cepero and another. In December, 1966, Castro met with Carril, reminded him of their earlier plan to counterfeit and asked him if he could dispose of some of the counterfeit money. This Carril agreed to do and took some samples. Shortly thereafter, Carta left the enterprise, giving his share of the money to Castro, and Castro and Castanera continued into a fourth edition of $20 bills, amounting to $100,000, part of which they sold and the rest of which they divided. Then the two split up. Castanera then told Carril of his activities and asked him to help him hide his share of the counterfeit currency. Carril, after requesting samples, gave Castanera the keys to an

apartment and instructed him where to hide the money. When Castanera was taken into custody, $304,000 in all denominations was found in the apartment. When Castro was arrested, it was Carril who informed and warned Castanera not to leave any evidence in his house. Even after Castro's first arrest, Carril made a further purchase on credit of $20,000 in bills from Castro, for which he never made payment. When Castro was arrested the second time, he had in his possession $80,950 in counterfeit bills of the three denominations.

This, in sum, was the testimony of Castro and Castanera after their plea of guilty. Apparently, it is the contention of Carta that his acquittal should have been directed because the proof of the conspiracy rested on the testimony of Castanera, who had given perjurious testimony before the Grand Jury, and because proof of possession and sale by Carta had not been established beyond a reasonable doubt.

■ The testimony we have set forth above fixed Carta along with Carril as one of the major operators of the conspiracy. Carta brought Castro into the venture; he introduced him to Castanera; and he financed the purchase of the printing press. Carta, as a witness, admitted knowing that Castanera and Castro were in the counterfeiting business, but denied any participation in it and denied that he had lived in the hotel at which Castro and Castanera testified they had regularly met with him during this time. In rebuttal, the Government established his residence at the hotel by the hotel manager. It was for the jury to determine whether Castro was to be believed, or whether he had perjured himself hoping thereby to obtain some consideration from the Government. The trial judge properly so charged.

Although Carta left the enterprise around the end of 1966, he was found guilty of possessing with the others the counterfeit money found in the apartment in March, 1967, on the evidence that he had given his share of the counterfeit money to Castro and had agreed to contribute to the rent for the apartment where it was stored; and had initially supplied the samples and the printing press on which was printed the fourth edition which followed his disagreement with Castro.

■ The charge of the Court was concise and clear. The jury was reminded of Carta's departure from the conspiracy before the fourth edition of counterfeit bills had been printed. It was instructed that it could not find Carta guilty of unlawful possession in March, 1967, unless it found that he had been a member of the conspiracy, that part of the counterfeit money found in March, 1967, was printed in furtherance of the conspiracy, and that some of it had been printed before Carta's withdrawal. It was correctly charged that, by leaving his share of the counterfeit money with Castanera and permitting its storage in the apartment, even if Carta otherwise had parted company with the group, it might be found that he was furthering the continuing object of the conspiracy, i. e., the disposal of the currency (United States v. Borelli, 336 F.2d 376 (1964, 2d Cir.); Hyde v. United States, 225 U.S. 347, 32 S.Ct. 793, 56 L.Ed. 1114 (1912)).

■ As for Carril's argument that there were several conspiracies, the evidence supported a finding of one conspiracy, and the jury was so charged. The purpose of the conspiracy was at all times the manufacture, possession and distribution of counterfeit currency.

■ While the indictment charged the counterfeiting of United States currency, the evidence as to the original plan to counterfeit Dominican pesos was properly received as background showing how the conspiracy charged burgeoned with the same equipment and the same actors. It required but a step to switch to dollars when the printing of the pesos proved beyond Castanera's ability. The printing of false identification cards was but another step in this

scheme for the purpose of giving Castanera a little practice and enabling him to show the others what he was capable of producing. It is admitted that Carril was in the original conspiracy to counterfeit Dominican currency. There was also evidence that he was informed of the decision to switch to dollars and that he agreed to lend the necessary funds for the changeover. That Carril may have appeared more active in the beginning when it was pesos they were to counterfeit, only to surface again months later when Carta had left and when Castro had been arrested, did not change the character of the conspiracy or the singlemindedness of the conspirators to engage in the counterfeiting business.

Finally, we come to Carril's argument concerning the Grand Jury testimony of Castro and Castanera.

As we have recounted, Castanera at the trial testified that, at his request, Carril provided him with the apartment in which to store some of the counterfeit money. On cross-examination, defense counsel elicited from him that he, Castanera, had told the Grand Jury that Castro and not Carril had made the arrangements for the apartment and that he was absolutely sure that he had not made any arrangements about it with Carril. Similarly, at the trial, Castro testified that Carril knew and had expressed approval of the idea that Castanera print United States dollars for the purpose of buying guns in Florida; that he had promised to finance the operation; that he had met him in December, 1966, at which time Carril had obtained samples of counterfeit money from Castro, had discussed the market with him and had later agreed to buy $50,000 notes from Castro and had taken $20,000 worth on credit. Before the Grand Jury, however, Castro had testified that he had never discussed counterfeit money with Carril.

■■ The point made here by Carril is that he was entitled to have the jury instructed that the prior inconsistent testimony before the Grand Jury given by these witnesses could be considered by the jury, not merely as impeaching their testimony on the trial but as substantive evidence exculpating Carril, to be given the same weight as that given on the trial which inculpated him. The request was made orally at the end of the Judge's charge. In all fairness to the Judge and to the Government, it should have been made in writing before the charge. It could have been denied on this ground alone (United States v. Kahaner, 317 F.2d 459 (2d Cir.), cert. den. sub nom., Corallo v. United States, 375 U.S. 835, 836, 84 S.Ct. 62, 11 L.Ed. 2d 65). The danger inherent in not complying with Rule 30 is emphasized in this case where the trial judge, taken by surprise by the oral request, at first stated he would so charge but later, coming to the conclusion that the case was controlled by United States v. Nuccio, 2 Cir., 373 F.2d 168, denied the requested charge. In fact, the charge was totally silent on this point, except that generally the jury was instructed that any witness might be discredited by prior contradictory evidence and that it was for the jury alone to determine what weight it would give such witness' testimony. There was no instruction that they might not consider the prior Castro and Castanera Grand Jury testimony as affirmative evidence of Carril's innocence. Obviously the jury believed the testimony given at trial rather than the testimony before the Grand Jury. In any event, the appellant had the benefit of the Grand Jury testimony which, in a most material point, directly contradicted the trial testimony of both Government witnesses so that, whether the jury believed the Grand Jury statements per se to be true or not, it was left free to disbelieve the trial testimony of both Castro and Castanera and all that they had testified to which inculpated Carril. More than that, Carril was not entitled to (United States v. Nuccio, supra). United States v. Borelli, 336 F.2d 376 is not in point.

The touchstone to reversible error is prejudice to the defendant. In view of

the fact that appellant had the benefit of the Grand Jury testimony and that the jury was free to consider it in determining whether the testimony at trial was to be believed, he can hardly complain that he was prejudiced.

The convictions are affirmed.