**UNITED STATES of America,**
**Plaintiff-Appellee,**

**v.**

**John DONO and Michael Bonaguro,**
**Defendants-Appellants.**

**Nos. 575, 576, Dockets 34244, 34378.**

United States Court of Appeals,
Second Circuit.

Argued March 5, 1970.

Decided June 15, 1970.

Certiorari Denied Oct. 12, 1970.

Joseph J. Petito, Brooklyn, N. Y., for defendant-appellant John Dono.

William Sonenshine, Brooklyn, N. Y., (Evseroff, Newman & Sonenshine, Brooklyn, N. Y., of counsel), for defendant-appellant Michael Bonaguro.

Michael Carnes, Atty., Dept. of Justice (Edward R. Neaher, U. S. Atty., and David M. Quinn, Spec. Atty., Dept. of Justice, Brooklyn, New York, of counsel), for the United States.

Before LUMBARD, Chief Judge, and ANDERSON, Circuit Judge, and DOOLING, District Judge.*

DOOLING, District Judge:

The indictment in seven counts, charged John Dono, Fred Dono, Michael Bonaguro and Frank Digiamo with passing, attempting to sell and fraudulently possessing on July 19, 1968, two hundred and fifty counterfeit twenty dollar Federal Reserve Notes (Counts Two, Three and Four), with passing, attempting to sell and fraudulently possessing another two hundred and fifty counterfeit Federal Reserve Notes on August 2, 1968 (Counts Five, Six and Seven), and with conspiring to possess and conceal, and to pass, utter, publish, and sell counterfeit twenty dollar Federal Reserve Notes. The outline of the offense, as the Government had evidently planned to prove it, was that Michael Bonaguro was a source of the counterfeit bills, that he passed them to John and Fred Dono, that they in turn passed them to or through Frank Digiamo to Emilio and Meliton Cubeiro, and that the Cubeiros passed the bills. Apparently because of the unwillingness of Emilio Cubeiro to testify, little evidence relevant to the July 19, 1968, transaction was available and the court dismissed Counts Two, Three and Four at the close of the Government's case. 294 F.Supp. 750. The case as to the four remaining counts, on which the appealing defendants were both convicted, came principally from the testimony of Meliton Cubeiro and that of the Secret Service agents who, having arrested Meliton Cubeiro on July 31st when he was attempting to pass $1,400 in counterfeit Federal Reserve Notes to a Secret Service agent, induced him to carry through under Government surveillance a further "buy" of counterfeit from his suppliers.

* Of the Eastern District of New York, sitting by designation.

The evidence warranted the jury in drawing the following conclusions about the facts:

Michael Bonaguro was engaged in business as Caton Scrap Metal Corporation, of which he was president, on Staten Island. John and Fred Dono were engaged in the operation of a gasoline station in Brooklyn, and John Dono lived with his family on Staten Island near Frank Digiamo. Frank Digiamo had long known Emilio Cubeiro, and Emilio and Meliton Cubeiro also lived on Staten Island a few blocks from where John Dono and Frank Digiamo lived. Some time before July 29, 1968, Emilio Cubeiro had obtained for $750 from a source apparently not known to Meliton Cubeiro five thousand dollars of counterfeit twenty dollar Federal Reserve Notes, and Emilio and Meliton Cubeiro each took twenty-five hundred dollars of the counterfeit notes. Before July 29th Meliton Cubeiro had disposed of his $2500 in counterfeit notes and had taken over from his brother Emilio a further $1400 of the notes. While he was attempting to sell these last notes to a Secret Service agent on the evening of July 31, 1968, Meliton Cubeiro was arrested, and undertook to "cooperate" with the Secret Service.

Before his arrest, on July 29, 1968, Meliton Cubeiro had met his brother Emilio with Frank Digiamo at his brother's house. Meliton and Emilio Cubeiro had earlier that day talked to one another about getting more counterfeit money, and Meliton raised with Digiamo and Emilio the matter of Digiamo's seeing whether he could get another $5,000 of counterfeit notes for Meliton Cubeiro. But Meliton Cubeiro was arrested on July 31st and he brought about his brother's arrest on the same night. The two were evidently to cooperate with the Secret Service; both were released without bail by the Commissioner the night of their arrest, and they returned home with the understanding that they would attempt to follow through on the purchase of the further $5,000 of counterfeit money under surveillance.

On the next evening, August 1, 1968, Meliton and Emilio Cubeiro met Frank Digiamo at Meliton Cubeiro's house around seven or seven thirty in the evening and talked. Meliton asked about the additional $5,000 of counterfeit money that he had spoken of two days earlier.

The earlier purchase of $5,000 worth of counterfeit had been managed by Emilio, and Meliton Cubeiro did not know from whom Emilio had bought the counterfeit; Meliton now pressed Frank Digiamo to introduce him directly to the supplier. The three men then drove to the house of John Dono in Frank Digiamo's car, and, after waiting about for Dono to appear, finally the three approached Dono in the driveway of his house, and Frank Digiamo introduced Meliton Cubeiro to Dono as Emilio's brother. Meliton asked John Dono about getting $5,000 in counterfeit twenties, and Dono said he would order them for Cubeiro for $750 and would let him know when he could have them. Something was said about a cheaper price later on, and Dono said that he would let Meliton Cubeiro know if he could get them any cheaper on the next buy. Cubeiro told Dono that he already had the $5,000 that he was ordering sold and wanted to buy another $5,000 right after that. No date for such a future delivery was then fixed.

The next morning Meliton Cubeiro ran into Frank Digiamo, and Digiamo told Meliton that John Dono had the money at his house, that he was leaving for work and that Meliton should go there and pick the money up. At that point Meliton returned to his house and telephoned the Secret Service. He waited until a Secret Service man came for him in a car. The two drove in the Agent's car to John Dono's house. The Agent searched Cubeiro and made sure that he had no counterfeit currency on him; Cubeiro was not supplied with any government money to pay for the counterfeit. Cubeiro then went up John Dono's driveway alone to the back door of Dono's house, knocked, was admitted, and was handed an envelope by John Dono which he saw at a glance contained money.

Dono suggested that Cubeiro count the money, but he declined to do so. He said that the money was out in his automobile and that he would take the counterfeit and go and get the money. Dono acquiesced, and Cubeiro went out to the car and showed the money to the agent. Other agents were present in other vehicles; they converged on the house, satisfied themselves that the money was indeed counterfeit, and promptly placed Cubeiro and Dono under arrest.

John Dono was taken to 90 Church Street and when he was searched there was found in his wallet a business card of Caton Scrap Metal Corp., Michael Bonaguro, President, with an address in Staten Island and a telephone number. John Dono agreed to make a telephone call to the number indicated on the business card, and the Agents recorded the ensuing conversation while one Agent listened to the conversation on an extension with John Dono's assent. The Agent testified that while he had never heard Michael Bonaguro's voice before either in face to face conversation or over the telephone, he became acquainted with his voice in consequence of arresting Bonaguro later and of hearing him talk at his arraignment and on another occasion. The telephone conversation, as it appears from the record and appellants' brief started with a sufficient exchange to indicate that it was a conversation between someone called Mike and another one called John. Assuming that the two were John Dono and Michael Bonaguro, the conversation went on as follows:

Dono: Did you give that to my brother last night?

Bonaguro: Yeah.

Dono: Yeah. Did he tell you that the guy wanted another five or what?

Bonaguro: Yeah. I couldn't get in touch with him; I called him from the, you know, station . . .

Dono: Yeah?

Bonaguro: He wasn't there though, you know, so I called him this morning; I mean, I forgot to call him this morning . . .

Dono: Yeah?

Bonaguro: So I didn't know. Well he's supposed to call me at three thirty.

Dono: Alright.

Bonaguro: Alright John.

Dono: Yeah.

Bonaguro: Yeah. I'll be able to get him [them?] for you and bring him [them?] over to you tonight.

Dono: OK.

Bonaguro: Alright, John.

Dono: So long.

Bonaguro: Oh, listen!

Dono: Yeah?

Bonaguro: If he asks me about the . . . You didn't give him the money, did you?

Dono: No, I didn't give him no money.

Bonaguro: Yes, the guy is . . . He wanted another five, right?

Dono: Yeah. So when you bring the other five around the guy is going to be there and I'll drop it off at the house later. I'll give you the whole fifteen hundred, whatever it is.

Bonaguro: Alright, OK. Take care, John.

Dono: Yeah, I'll see you later.

No immediate action was taken against Bonaguro. However, on August 6th he was arrested at his place of business. He had on him other business cards that were the counterparts of the business card found in the wallet of John Dono, and he had on his person $1,978 in currency.

Such were the facts that the jury could find if it accepted the Government's evi-

dence as true and rejected the defendants' evidence.

1. The question of the admissibility of the evidence that the defendant had on him $1,978 in currency became confused in a question over whether there had been an order suppressing evidence of the discovery, and then in a further confusion over whether the evidence of it should be "suppressed" at the trial. But the Court was made aware, though hardly plainly aware, that the admissibility of the evidence of the discovery of the money on Bonaguro was objected to on the grounds that it was neither inferable that it had been derived from any specific counterfeit transaction relevant to the case, nor could it be viewed as evidence that the defendant Bonaguro was in the business generally of selling counterfeit currency for genuine currency. Both Bonaguro and Dono joined in the objection.

The currency could have included money derived from the transaction involved in the three substantive counts, only if Digiamo or Dono paid Bonaguro against delivery, and that would not account for more than $750, or, at most for $1,500, if it be assumed that there had been an earlier transaction of exactly the same sort giving rise to the Cubeiros' earlier sales of counterfeit. Possession of the currency was at best evidence that Bonaguro was engaged in other such sales with or through Digiamo or Dono if, but only if, the jury so inferred and connected it with the conspiracy count. However, Bonaguro tried to prove that the currency represented the proceeds of a specific scrap metal transaction, and in the effort he aroused more suspicion than he allayed. The explanation—not given by Bonaguro, who did not testify—was that Bonaguro had sold scrap to another company for $3,700 on August 2d, four days before the arrest, and that a check was issued by the buyer to cover the sale which was payable to Viscardi, a young truckdriver who was, ordinarily, a casual employee of a corporation that shared the same offices with Bonaguro's company. Viscardi testified that when he got the check he immediately turned it back to the issuer for cash and turned the cash over to Bonaguro.

■ Whether or not evidence about the currency should have been admitted is primarily a question of balancing relevancy against unwarranted prejudice, a question on which a proper deference to the trial judge's sense of the trial atmosphere is peculiarly appropriate. United States v. Craft, 6th Cir. 1969, 407 F.2d 1065, 1070; cf. United States v. Jackskion, 2nd Cir. 1939, 102 F.2d 683, 684. See McCormick, Evidence, 1954, 318–319. Irrelevancy is as apparent to jurors as it is to jurists. If possessing the currency was not persuasive of complicity in the charged counterfeiting conspiracy, then the evidence was hardly damaging. The evidence Bonaguro called to suppress the inference he evidently feared may have suggested to the jury that the use of cash was not usual to the scrap metal trade, and they may well have inferred a consciousness of a guilty connection of the cash with the counterfeit dealings from the inadequacy of the evidence produced as compared with such simpler proofs as bank deposit records. There is no reason to suppose that the jury viewed the currency matter in anything other than a healthy and wordly-wise perspective.

2. The Court cut off cross-examination of Cubeiro about his sales of counterfeit on Fifth Amendment grounds, and Dono complains of this.

Dono's defense did not turn on that point. Dono was not himself a witness. He presented evidence that Meliton Cubeiro, when he got out of the Secret Service Agent's car at Dono's house and walked up the driveway, stooped down and picked up an envelope from the bushes that grew alongside the driveway on an adjacent vacant lot, and carried that envelope into John Dono's house where, there was testimony, John Dono was heard to reject some proposal made to him by Cubeiro. The defense, in a word, was that Cubeiro was not a buyer from John Dono but an attempted seller of counterfeit currency to John Dono.

Dono's cross-examination of Cubeiro about his earlier passing of counterfeit currency might have brought out further that Cubeiro had procured that currency from his brother Emilio and, inferentially, not necessarily from John Dono. Further questioning might have tended further to damage Cubeiro's credibility as a witness.

■ In the total circumstances of the case the cutting off of cross-examination was not prejudicial, and did not so deprive the defendant of his rights of cross-examination as to warrant striking the testimony of Cubeiro. The witness had in other parts of his testimony fully portrayed himself as a passer of counterfeit; he testified to having disposed of at least $2500 of counterfeit money and to having been arrested in the process of trying to sell $1400 of counterfeit notes. In that setting the prevention of further testimony on the self-incrimination ground did not in fact exclude the significant matter that it was the purpose of the cross-examination to emphasize. See United States v. Cardillo, 2d Cir. 1963, 316 F.2d 606, 610–614.

■ 3. Dono contends, first, that the counterfeit money should have been suppressed as illegally obtained because it was obtained by having Cubeiro, the Government's "agent," enter Dono's home in the guise of a buyer and pretend to buy the counterfeit money. But there was neither a search nor a seizure. Dono willingly entered into the transaction meaning it to be what it was, an illegal sale of counterfeit notes to a willing buyer. That the buyer meant to betray Dono to the Secret Service agents did not alter the consensual nature of the transaction.

■■ Dono argues, next, that it was error not to charge entrapment. The evidence was, however, that the transaction of August 2 had been initiated by Meliton Cubeiro with Digiamo on July 29, before Cubeiro's arrest and his undertaking to cooperate. The Government but took advantage of an on-going course of criminal dealing to obtain specific evidence; it was not the author of

the crime, nor did it instigate its commission; rather, it afforded an opportunity for the continuation of an established course of criminal conduct. Lopez v. United States, 1963, 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462; United States v. Henry, 2d Cir. 1969, 417 F.2d 267, 270.

■ Dono's final contention that the "Miranda warning" (Miranda v. Arizona, 1966, 384 U.S. 436, 478–479, 86 S. Ct. 1602, 16 L.Ed.2d 694) was inadequate, especially in view of his diabetic condition, is wholly without support in the evidence. The warning was complete and careful, and the defendant, very evidently, was, originally, altogether willing to cooperate in the effort to broaden the investigation.

4. Bonaguro contends that the jury's persistent interrogation of the Court about the distinction between guilt of conspiracy and guilt as one of several persons aiding and abetting one another in the commission of a crime, coupled with the manner in which the verdict was first returned, indicate in combination that the jury did not comprehend the Court's charge. It is not argued, nor does it appear that the Court erred in its charge or supplemental charge.

■ Far from indicating incomprehension, the jury's questioning of the Court manifested a conscientious pursuit of an elusive but at times important distinction (cf. Pinkerton v. United States, 1946, 328 U.S. 640, 646–647, 66 S.Ct. 1180, 90 L.Ed. 1489; United States v. Guidice, 2d Cir. 1970, 425 F.2d 886); the interrogation did credit to the jury, and the Court's determination to satisfy the jury's inquiry was exemplary and successful.

When the jury, returning a verdict on the conspiracy count, declared itself unready to give a verdict on the substantive counts because it "thought * * * that if a conspiracy existed that because one member was guilty it automatically made all the *members* equally guilty if a conspiracy existed" (emphasis supplied), it intuitively located a genuine area of overlap between

Sections 2 and 371 of Title 18, and underrated the force of the charge that conspiracy is of itself a distinct offense even when the elements establishing culpable membership in the conspiracy and shared guilt of the conspiracy offense are also indispensable and sufficient to the proof of the substantive offense, particularly in its Section 2 aspect.

■ 5. The sufficiency of the evidence to convict Bonaguro presents the most substantial of the questions raised on the appeals. When the government rested at the close of the whole case, Bonaguro's counsel agreed that Count Six could properly be submitted to the jury (Tr. 2522), and that count charged that the defendants with intent to defraud attempted to sell 250 counterfeit Federal Reserve Notes knowing that they were counterfeit.

The validity of the verdict depends ultimately on the weight which the jury could rationally accord to the overheard telephone conversation between John Dono and the defendant Bonaguro. The telephone conversation, if it stood alone, would be so cryptic that it could not be argued successfully that it would support a conviction. But the conversation did not exist in isolation from the events that had gone before, and the jury heard it aware of what had gone before, according to the Government's evidence, and equipped to translate its shorthand into understandable language. If the jury accepted the Government's evidence in its principal parts, it understood that some time before $5,000 in counterfeit purchased for $750 had come to the hands of Emilio Cubeiro through Digiamo and beyond him from John Dono, and that on the evening preceding the telephone conversation, Meliton Cubeiro, in the presence of his brother Emilio and Digiamo, had ordered another $5,000 of the counterfeit from Dono for the price of $750 and had raised the question of a still further $5,000. The jury knew too that John Dono and his brother Frank worked together in the Dono Brothers gas station on Flatlands Avenue in Brooklyn. Against that background the telephone conversation drops into place as neatly as the last piece that completes the picture in a difficult Chinese-puzzle. Bonaguro tells Dono that he had given the money to Frank Dono on the preceding night and that Frank Dono had passed on to him the word that the buyer who had ordered the $5,000 wanted a further $5,000; that Bonaguro had then tried to telephone his supplier from the gas station but could not reach him and was supposed to but forgot to call the supplier on the following morning; that he, Bonaguro, did not expect to hear from his supplier until later on the day of the telephone talk; Bonaguro then said that he would be able to get the supplier for John Dono and bring him over to Staten Island that night, but, before breaking off the conversation, Bonaguro wanted to know from Dono whether he had already passed the money along, since the supplier might ask Bonaguro that question. Dono answered—mendaciously, of course—that he had not passed the money. Bonaguro then put in—as if to make the point perfectly clear so that he could repeat it to the supplier—that the buyer wanted another $5,000; to this Dono answered in the affirmative, and then said that when the still further $5,000 was brought around and the buyer was there he would drop it off at the house later on and give Bonaguro the whole $1,500 or whatever it was.

Despite the initial uncertainty as to exactly how the very last part of the conversation parsed and should be distributed between Bonaguro and Dono, the meaning of the whole is inescapably clear if the jury accepted, as it was free to accept, the Government's evidence in its principal emphases and the Secret Service Agent's identification of Bonaguro as the speaker. The last point, identification of Bonaguro as the speaker, was not wholly dependent on voice-recognition: the Secret Service Agents supervised the placing of the telephone call to Michael Bonaguro's place of business and to his telephone number as given on his business card, and, in the

conversation that followed, the person called identified himself as "Mike."

So viewing the telephone conversation in the total setting of the case, the jury could readily find beyond a reasonable doubt that Bonaguro's role was central and important in the conspiracy and in the substantive offenses. Very little is left to inference and nothing to conjecture once the meaning of the highly referential words used in the short telephone conversation is read out from the background of the speakers and the call as it was known to the jurors.

The judgments of conviction are, accordingly affirmed.