**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Anthony LA VECCHIA et al.,
Defendants-Appellants.**

**No. 599, Docket 74–2272.**

United States Court of Appeals,
Second Circuit.

Argued Jan. 22, 1975.

Decided April 4, 1975.

David A. De Petris, Asst. U. S. Atty., Eastern District of New York (David G. Trager, U. S. Atty., Eastern District of New York, and Paul B. Bergman, Asst. U. S. Atty., on the brief), for plaintiff-appellee.

James La Rossa, New York City (La Rossa, Shargel & Fischetti and Gerald L. Shargel, New York City, on the brief), for defendants-appellants Anthony La Vecchia and Edward Bogan.

Barry Krinsky, Brooklyn, N. Y. (David W. McCarthy, Mineola, N. Y., on the brief), for defendant-appellant Herbert Kurshenoff.

Ira Leitel, Brooklyn, N. Y. (Harold B. Foner, Brooklyn, N. Y., on the brief), for defendant-appellant Nicholas Andriotis.

Before LUMBARD, HAYS and MULLIGAN, Circuit Judges.

LUMBARD, Circuit Judge:

Anthony La Vecchia, Edward Bogan, Herbert Kurshenoff, and Nicholas Andriotis appeal from their conviction by an Eastern District jury of various counterfeiting offenses. See 18 U.S.C. §§ 371, 472, 473.[1] La Vecchia and Bogan claim that several remarks of the trial judge were so unfair and unsupported by the evidence as to require reversal of their convictions and that the single conspiracy alleged in the indictment was not proven. In addition, La Vecchia asserts that some evidence was improperly introduced at trial because it was obtained by an illegal search of his automobile, while Bogan asserts that the affidavit in support of the issuance of the warrant authorizing the search of his business premises was legally insufficient and contained a materially false statement. Kurshenoff and Andriotis both claim that the proof was insufficient to establish their membership in a conspiracy to

[1] La Vecchia was convicted of one count of conspiracy to possess and distribute counterfeit $10 Federal Reserve notes and four counts of possession and distribution of such notes. He was sentenced to concurrent four-year terms on each count and fined $5000.

Bogan was convicted on the conspiracy count and of one count of distributing counterfeit money. He was sentenced to concurrent four-year terms on each count.

Kurshenoff was convicted on the conspiracy count and was sentenced to six months in prison to be followed by twelve months on probation. He was fined $750.

Andriotis was convicted on the conspiracy and of one count of receiving counterfeit money. He was sentenced to concurrent sentences of one year—eight months of which was suspended and put on probation for two years.

distribute counterfeit money. We affirm.

The heart of the government's case consisted of testimony by two former counterfeit distributors, John McMillan and Dominic Russo, who had been caught selling counterfeit money by government agents. McMillan testified that in June 1971 he bought $300,000 in counterfeit $10 Federal Reserve notes on consignment from La Vecchia for nine points (nine cents on the dollar), and that he sold all of the counterfeit to Russo and six other individuals at various times for various prices. Russo testified that he bought a total of $20,000 in counterfeit from McMillan and that he sold it to other persons, several of whom were later arrested for passing the counterfeit money.

In June 1972 McMillan and Russo discussed obtaining further counterfeit and thereafter McMillan contacted La Vecchia and bought $25,000 in counterfeit $10 Federal Reserve notes. He delivered these to Russo who testified he sold $5000 to Kurshenoff and about $15,000 to one Phil Martino. The remaining notes were not good enough to attempt to sell. McMillan testified that shortly thereafter he bought a second $25,000 package from La Vecchia. This time when he went to La Vecchia's house to pick up the money, he had to wait until someone brought the counterfeit to La Vecchia. McMillan gave the money to Russo and Russo testified that he then sold another $5000 package to Kurshenoff [2] and another $15,000 or so to Martino.

About the beginning of August, McMillan bought $100,000 from La Vecchia and delivered it to Russo, who sold $10,000 to Martino. In addition, Russo attempted to negotiate a sale of counterfeit to Andriotis. They were unable to agree on a sales price, and McMillan took charge of the negotiations and reached a satisfactory agreement with Andriotis for the sale of a $10,000 package. Russo testified that Andriotis told him to drive down 44th Street and give the package to "Paul" when he stops you and asks if you have a package for me. Russo followed these directions and made the delivery. Andriotis paid Russo $1400 for the package. Thereafter Martino was arrested when he sold counterfeit to a Secret Service agent. Martino arranged a meeting between Russo and the agent and Russo sold a $5000 package to the government agent, after which Russo was arrested. He implicated McMillan as his source and McMillan was arrested in January of 1973.

At this point the government arranged an elaborate scheme in an attempt to catch La Vecchia red-handed. On February 13, 1973, McMillan contacted La Vecchia and said he wanted to buy a $25,000 package and take delivery on February 15.[3] On the 15th, McMillan met with La Vecchia at Beacon Discount Sales, 125 East 18th Street, to consummate the transaction. McMillan was to pay La Vecchia $2500 and in turn receive a key to a Penn Station locker where the counterfeit would be placed. After finalizing these arrangements La Vecchia left 125 East 18th in his car and shortly thereafter government agents observed him entering 270 Lafayette Street, where Bogan's printing shop was located.[4] La Vecchia left shortly after entering the building. Meanwhile, Bogan arrived at 125 East 18th shortly after La Vecchia had left. He received a telephone call and left. He was followed by agents [5] who observed him meet with

---

2. Both times Russo sold a package to Kurshenoff, McMillan testified that he waited in the car downstairs in front of Kurshenoff's place of business.

3. On both the 13th and the 15th McMillan was outfitted with a radio transmitting device so the arrangement of the sale was overheard by the government agents.

4. An agent had visited these premises a week before and had noted that signs reading "Beacon Press" and "Beacon Sales" were displayed there.

5. McMillan was still present at 125 East 18th when Bogan arrived, and he told the agents by radio that he recognized Bogan's voice as the voice of the person who delivered the counterfeit to La Vecchia's house in 1972.

La Vecchia in the latter's car. La Vecchia then drove to 125 East 18th, picked up McMillan, and gave McMillan the locker key in return for $2500 in genuine currency, the serial numbers of which had been recorded by government agents. Thereafter, the $25,000 package of counterfeit was found in the Penn Station locker. At this point La Vecchia and Bogan were arrested.

At the time of his arrest, $50 of the prerecorded purchase money was found on La Vecchia's person, and the remaining $2450 was found in the trunk of his car. Subsequent to the arrests, a warrant search of 270 Lafayette was conducted. Some $650,000 in counterfeit notes was found along with the plates and negatives used to print them. Bogan's fingerprints were found on the wrappings of the Penn Station package and on one plate, one negative, and several notes found at 270 Lafayette. A government expert testified that the negatives at 270 Lafayette had been used to produce the counterfeit involved in the arrests in 1971, 1972, and 1973.

The jury convicted all four defendants and no question is raised concerning the sufficiency of the evidence on the substantive counts.

■ La Vecchia and Bogan initially argue that certain of the trial judge's remarks at the close of the trial constituted improper comment on the evidence in the case. It has long been recognized that a federal trial judge may comment on the evidence. Quercia v. United States, 289 U.S. 466, 53 S.Ct. 698, 77 L.Ed. 1321 (1933). The only issue here is whether the challenged comments were so unfair and unwarranted as to require reversal of defendants' convictions.

■ The first comment to which defendants object concerned the fingerprint evidence. Both La Vecchia's and Bogan's counsel stressed in their summations that only a few of Bogan's fingerprints had been found on the thousands of bills and the plates and negatives seized at 270 Lafayette. They both suggested to the jury that the prints might have been made at police headquarters, hinting that perhaps the prints resulted from the agents handing Bogan several bills at that time. In his summation of the evidence, the trial judge remarked:

> I did not hear any testimony about what is necessary to produce clear fingerprints but I was impressed by the fact that after examining all this counterfeit money Mr. Ball [the fingerprint expert] found only seven latent prints besides those that were on, so apparently fingerprints do not show up every time.

Defendants claim that this statement may have been factually inaccurate and that it was unfair comment. We disagree. The statement was accurate, at least insofar as there is evidence in the record to support it. The government's fingerprint witness indicated in his testimony that the simple act of touching an object does not always produce fingerprints on the object.[6]

Bogan and La Vecchia also take issue with the judge's remark that there were "only seven latent prints." In objecting, defense counsel stated that the fingerprint expert stated that "there were only seven latent prints, meaning seven different *types* of fingerprints, not seven individual prints." (emphasis added) Our review of the expert's testimony leads us to conclude that he meant that he found seven individual prints. However, this is immaterial since the trial judge did not say seven *individual* prints, but in fact used the same language that defense counsel asserted the expert used —"seven latent prints."

---

6. After both the witness and defense attorney had handled some counterfeit bills, the attorney asked:

Q. [M]y fingerprints are on these bills?
A. Not necessarily.

Q. They might not be?
A. Might not be.
Q. Your fingerprints might be on the bills?
A. Might be.

These statements of the trial judge were supported by evidence in the record, and they were not improper or unfair comment. The judge did not add to or distort the evidence in the record. Compare United States v. Pinto, 503 F.2d 718 (2d Cir. 1974).[7]

■ Defendants' second complaint of an improper remark by the trial judge concerned the judge's statement that

"[t]here was a suggestion by the defendants that you should consider the fact that the defendants are businessmen and the witnesses are criminals. One of the problems federal court have in [is?] trying to see that we do not deal with white-collar criminals on a different basis from the crimes of working men."

The judge later stated in a similar vein, "If these defendants are not guilty you should acquit them. If you find they are guilty beyond a reasonable doubt, the fact that they are businessmen is no excuse and you might consider that for all the counsel said about Mr. McMillan's bad character, Mr. La Vecchia talked with him for several hours on February 13th and 15th although you are asked to believe it had nothing to do with counterfeit."

These comments were provoked by defense counsel's attempt to suggest that McMillan might attempt to implicate honest businessmen in this counterfeiting operation because he was afraid to identify his real suppliers. The basis of the suggestion was testimony that McMillan had had some earlier connection with members of organized crime in a drug transaction. Defense counsel noted that McMillan's suppliers in this criminal undertaking might be members of organized crime and that McMillan might be anxious to avoid the possible consequences of implicating them.

The judge's comment on the possible implications to be drawn from La Vecchia's meetings with McMillan was clearly

uncalled for. It appears that the remainder of the trial judge's comments were sparked by his mistaken belief that defense counsel had suggested that since defendants were businessmen, they should not be found guilty. While the remarks would have better been left unsaid, we do not think that they prejudiced defendants. The statement that white-collar criminals should not receive special consideration is in itself unobjectionable. And standing alone the statement about La Vecchia's associations with McMillan does not call for reversal of La Vecchia's conviction. It consists of only one statement in an otherwise proper charge. In addition, there was overwhelming and uncontroverted direct evidence that La Vecchia was involved in this counterfeiting operation. In light of the total record, we find no reversible error in the judge's comments on the evidence. See United States v. Pinto, *supra*; United States v. Birnbaum, 373 F.2d 250 (2d Cir.), cert. denied, 389 U.S. 837, 88 S.Ct. 53, 19 L.Ed.2d 99 (1967).

■ La Vecchia's second argument is that the district court improperly denied his motion to suppress $2450 in prerecorded government monies which were found during a warrantless search of the trunk of his automobile. The money was part of the $2500 advanced to McMillan for the purchase of counterfeit money. The remaining $50 in prerecorded money was found on La Vecchia's person when he was arrested.

The necessity for a warrant in these circumstances is governed by 49 U.S.C. §§ 781–789 and our decision in United States v. Francolino, 367 F.2d 1013 (1966), cert. denied, 386 U.S. 960, 87 S.Ct. 1020, 18 L.Ed.2d 110 (1967), which was most recently reaffirmed in United States v. Capra, 501 F.2d 267 (2d Cir. 1974), cert. denied, —— U.S. ——, 95 S.Ct. 1424, 43 L.Ed.2d 670 (1975). Section 781(a) provides that

[i]t shall be unlawful (1) to transport, carry, or convey any contraband arti-

---

7. There was nothing in the record that supported defense counsel's suggestion that Bo-

gan's fingerprints were placed on the bills at the police station.

cle in, upon, or by means of any vessel, vehicle, or aircraft; . . . or (3) to use any vessel, vehicle, or aircraft to facilitate the . . . sale . . . of any contraband article.

The statute defines "contraband" to include counterfeit money, 49 U.S.C. § 781(b), and authorizes the seizure of any vehicle used in violation of section 781. 49 U.S.C. § 782. *Francolino* authorizes the warrantless search of vehicles subject to seizure under section 782. The only requirement is that there be probable cause to believe that the vehicle is seizable under section 782.

La Vecchia claims that *Francolino* is inapplicable to this case for two reasons. First, La Vecchia argues that the agents had no probable cause to believe that the car had been used to transport contraband. While it is true that the agents knew that the car was not used to transport the counterfeit money directly to McMillan, there was evidence in the record that showed that counterfeiters often carry "extra" counterfeit money with them on the chance that the buyer may be persuaded to purchase more than he had originally intended to buy. In fact, one agent testified that this happened in one of the transactions involved in this case. Moreover, during the day in question La Vecchia had been to the address which was believed to be the source of the counterfeit money and he had met in his car with Bogan who transported the $25,000 in counterfeit that was placed in the Penn Station locker. Taken together, and in consideration of the agent's knowledge of La Vecchia's extensive counterfeiting activities, these facts were a sufficient basis to give the agents probable cause to believe that the car had been or was being used to transport contraband. *See* United States v. Capra, 501 F.2d at 280.

■ Even if we concluded that the agents did not have probable cause to believe that La Vecchia's car had been used to transport contraband, the *Francolino* rule would still apply here. The third clause of section 781 make it unlawful to use a vehicle to facilitate the

sale of contraband, and there is no doubt that the agents had good reason to believe that La Vecchia's car was used to facilitate the sale. The complex delivery plan adopted by La Vecchia and Bogan necessitated that each of them travel quickly about the city. La Vecchia's use of his automobile was a necessary part of the transaction. The car was used to find Bogan to consummate the deal. Indeed, "token" possession of the contraband was transferred in the car when Bogan gave La Vecchia the key to the Penn Station locker and when La Vecchia later gave it to McMillan. Thus, the officers had sufficient reason to believe that La Vecchia's car was used to facilitate the transfer of contraband. *See* United States v. One 1957 Lincoln Premiere, 265 F.2d 734 (7th Cir.), cert. denied, 361 U.S. 828, 80 S.Ct. 76, 4 L.Ed.2d 70 (1959); United States v. One 1950 Buick Sedan, 231 F.2d 219 (2d Cir. 1956); United States v. One 1951 Oldsmobile Sedan, 126 F.Supp. 517 (D.Conn.1954); United States v. One 1941 Pontiac Sedan, 83 F.Supp. 999 (S.D.N.Y.1948); United States v. One Dodge Coupe, 43 F.Supp. 60 (S.D.N.Y.1942). Compare United States v. (One) (1) 1971 Chevrolet Corvette Automobile, 496 F.2d 210 (5th Cir. 1974); Howard v. United States, 423 F.2d 1102, 1103 (9th Cir. 1970).

■ Second, La Vecchia next notes that his car was never actually seized whereas in *Francolino* the car was seized after it was searched. He then argues that *Francolino* should not apply when the car is never seized. We disagree. In *Francolino,* we expressly rejected the argument that a vehicle must be seized before it can be searched. If a vehicle can be searched prior to seizure, the actual act of seizure is unimportant. As the agents had probable cause to believe that La Vecchia's car was subject to seizure under section 782, they could legally search it. It makes no sense to say that some later action or inaction on their part would somehow void the theretofore valid search. The time of the search is the critical time, and at that time the warrantless search was permissible be-

cause the agents believed the car was subject to seizure. What is later done with the car is irrelevant. See United States v. Trabucco, 424 F.2d 1311, 1313 n. 2 (5th Cir.), cert. dismissed, 399 U.S. 918, 90 S.Ct. 2224, 26 L.Ed.2d 785 (1970).

Finally, we note that whether or not the search of the automobile was improper, the admission of the $2450 in marked money was harmless error. Part of the marked money had been found on La Vecchia's person and no question has been raised concerning its admissibility. Since part of the package of premarked money was admissible and there was evidence that $2500 had been paid to La Vecchia, admission of the remaining part of the package of premarked money was harmless beyond a reasonable doubt. Chapman v. Calif., 386 U.S. 18, 21–24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Harrington v. California, 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969); Chambers v. Maroney, 399 U.S. 42, 53, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); United States v. Bazinet, 462 F.2d 982, 988 n. 4 (8th Cir.), cert. denied, 409 U.S. 1010, 93 S.Ct. 453, 34 L.Ed.2d 303 (1972).

Third, La Vecchia and Bogan argue that the warrant authorizing the search of the premises of Beacon Discount Sales and Beacon Printing at 270 Lafayette Street was improperly issued. First, they suggest that the affidavit in support of the warrant was insufficient because it failed to establish probable cause that counterfeit notes and counterfeiting paraphernalia would be found at that address. We disagree. The affidavit provides a reasonable basis for believing that La Vecchia was a major supplier of counterfeit money and that Bogan had delivered counterfeit bills to La Vecchia in the past and had apparently placed such bills in the Penn Station locker on February 15, 1973. Furthermore, it indicated that Bogan had been arrested on the premises and a counterfeit note and counterfeit stamps had been found on his person, and that the counterfeit money in this case had been produced by offset printing and the agents at the time of the arrest and on one earlier occasion had seen offset printing presses on the premises. In light of La Vecchia's and Bogan's unquestioned connections with the premises, the presence of the type of presses that produced the counterfeit, and Bogan's role as deliverer of counterfeit, it was reasonable to believe that counterfeit monies and plates would be found on the premises at 270 Lafayette. The affidavit was clearly sufficient; there was probable cause to believe that counterfeit and counterfeiting paraphernalia would be found at 270 Lafayette.

La Vecchia and Bogan also claim that the affidavit was insufficient because it contained a materially false statement.[8] Specifically, the affidavit alleged that La Vecchia was doing business as Beacon Discount Sales at 270 Lafayette Street and at 125 East 18th Street in partnership with Edward Bogan and that the two men also operated Beacon Printing. The affidavit indicated that these assertions were based in part on an examination of a Dun and Bradstreet file on the businesses. It is conceded that that file indicated only that Bogan was the owner of Beacon Printing. While the wording of the affidavit is ambiguous[9] it is arguable that the allegation that La Vecchia owned Beacon Printing was based entirely on the information incorrectly attributed to Dun and Bradstreet. However, since La Vecchia was otherwise connected with the premises[10] we agree with Judge

8. The district court noted that there was no showing that the false statement was made intentionally. Indeed, in light of all the other facts detailed in the four-page affidavit there was certainly no reason for the agent to make any false statement in this one minor respect.

9. The affidavit could be interpreted as alleging that La Vecchia's co-ownership of Beacon Printing was based on general investigations by agents and information obtained by infor-

mants, and not solely on the Dun and Bradstreet report.

10. There is no claim that La Vecchia was improperly connected to the premises through Beacon Discount. McMillan had told the agents that La Vecchia operated Beacon Discount and that one of his places of business was 270 Lafayette. A Beacon Discount sign had been observed earlier by an agent at 270 Lafayette.

Judd's conclusion that the false statement was immaterial. As indicated in our discussion of the affidavit's sufficiency, there were more than ample grounds for issuing the search warrant without consideration of La Vecchia's alleged co-ownership of Beacon Printing. See United States v. Gonzalez, 488 F.2d 833, 836–38 (2d Cir. 1973).

Finally, La Vecchia and Bogan argue that the evidence did not establish the existence of a single conspiracy as was charged in the indictment. They contend that the trial judge incorrectly viewed the evidence as establishing a horizontal conspiracy between La Vecchia and Bogan spanning 1971 to 1973. La Vecchia and Bogan contend that there was no evidence that they conspired with either the buyers or distributors of the bogus currency and that the success of their conspiracy did not depend on the performance of others unknown to them. They suggest they were prejudiced by the admission of evidence concerning McMillan's and Russo's activities because that evidence diverted the jury's attention from the careful consideration of their guilt or innocence.

■ La Vecchia and Bogan clearly conspired with each other to print and distribute counterfeit. Since the negatives found at 270 Lafayette were used to produce all of the counterfeit involved in this case, their conspiracy lasted at least for the twenty-month period covered in the indictment. The amount of counterfeit they printed was so large that the success of their conspiracy obviously depended on distribution of the counterfeit by others. McMillan's continual buying of counterfeit ($450,000 on five occasions within a twenty-month period) was more than sufficient to enable the jury to conclude that he was a member of the La Vecchia-Bogan conspiracy as a wholesale distributor of bogus money.

Moreover, McMillan's purchases of counterfeit were so substantial that La Vecchia and Bogan knew, or certainly should have known, that McMillan must have dealt with others in passing the counterfeit to the public. The workings of such a counterfeiting operation are analogous to those of a large narcotics ring. While each member of the conspiracy may not know of others in different levels, certainly those at the top, who are aware of the scope of the operation, know that its success depends on many persons—ringleader, printer, wholesale buyers, and distributors. United States v. Arroyo, 494 F.2d 1316, 1319 (2d Cir.), cert. denied, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974). Thus, McMillan's efforts at distribution were part of the La Vecchia-Bogan conspiracy to print and distribute counterfeit. Evidence concerning McMillan's activities was properly admitted.

■ The only argument raised by Andriotis and Kurshenoff is that the evidence was insufficient to establish that they were members of the conspiracy involving La Vecchia, Bogan, McMillan, and Russo. The evidence indicated that Andriotis bought one package of counterfeit money from Russo in 1972 and that Kurshenoff bought two such packages in the same year. In the light of their more limited involvement, the trial court instructed the jury that they could properly conclude that there were three conspiracies shown by the evidence—one in each of 1971, 1972, and 1973—and that Kurshenoff and Andriotis were members of only the 1972 conspiracy.[11]

■ We have previously held:

For a single act to be sufficient to draw an actor within the ambit of a conspiracy to violate the federal narcotics laws, there must be independent evidence tending to prove that the defendant had some knowledge of the broader conspiracy, or the single act itself must be one from which such knowledge may be inferred.

---

11. A variance from the indictment is permissible since the variance did not prejudice any of the defendants. See United States v. Agueci,

310 F.2d 817, 827 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

United States v. De Noia, 451 F.2d 979, 981 (2d Cir. 1971) (per curiam). The evidence must be sufficient to justify "an inference that [a defendant] knew he was involved in a criminal enterprise of substantial scope." 451 F.2d at 981.

■ Since Andriotis and Kurshenoff intended to pass or sell the counterfeit bills they bought from Russo they were in fact involved in the distribution of counterfeit money. The question is whether the record contains sufficient facts from which the jury could infer their knowledge or the broader criminal enterprise involved in this case. The fact that Andriotis and Kurshenoff dealt with only one or two members of this counterfeiting conspiracy does not preclude a finding that they were members of the conspiracy charged in the indictment. United States v. Agueci, 310 F.2d 817, 826 (2d Cir. 1962), cert. denied, 372 U.S. 959, 83 S.Ct. 1013, 10 L.Ed.2d 11 (1963).

■ Examining the evidence of Andriotis' involvement we think the fact that he dealt with both Russo and McMillan is evidence from which the jury could infer that he knew that he was involved in a broad criminal enterprise. Moreover, Andriotis negotiated the price in terms of "points" suggesting some familiarity with the counterfeiting trade which often is conducted on a large scale with many persons involved. United States v. Rizzo, 492 F.2d 443 (2d Cir. 1974); United States v. Dono, 428 F.2d 204 (2d Cir.), cert. denied, 400 U.S. 829, 91 S.Ct. 57, 27 L.Ed.2d 59 (1970); United States v. Gonzalez-Carta, 419 F.2d 548 (2d Cir. 1969). The size of Andriotis' purchase ($10,000) was sufficiently large that the jury could infer that he must have known that he was engaged in a substantial operation. In any event, the evidence to convict Andriotis of the substantive count was clearly sufficient. Since he received concurrent sentences on the conspiracy and substantive counts, a valid conviction on the substantive counts provides a sufficient basis to

affirm the judgment from which Andriotis appeals. De Noia, 451 F.2d at 981.

■ As to Kurshenoff, we have little hesitation in affirming his conviction for conspiracy. Like Andriotis, he negotiated the sale price in terms of points. Moreover, he bought large packages of counterfeit ($5000 each) from Russo on two occasions. In fact, Russo called him up immediately after receiving his second batch of counterfeit from McMillan in the summer of 1972 and told Kurshenoff he was coming right over with some. This action by Russo could lead the jury to believe that Kurshenoff had become a regular participant in the distribution of counterfeit. Kurshenoff must have known that other persons were supplying Russo with counterfeit money. On the basis of this information the jury could properly infer that Kurshenoff had "some knowledge" of the broader conspiracy and that Kurshenoff knew he was involved "in a criminal enterprise of substantial scope." De Noia, 451 F.2d at 981. See also United States v. Rizzo, 492 F.2d 443 (2d Cir. 1974).

We have considered the other contentions raised by appellants and find them to be without merit.

Affirmed.

MULLIGAN, Circuit Judge (concurring):

I concur in the majority opinion except that I cannot agree that the evidence adduced at the trial of this case was sufficient to establish that Herbie Kurshenoff was guilty of the single chain conspiracy charged in the indictment. There was a variance in the proof which at best established that Kurshenoff was guilty of a separate conspiracy with Russo for the sale and purchase of the counterfeit $10 bills. This was not the crime charged in the indictment, not the theory of the Government's case below or on appeal and not the conspiracy charged to the jury by the court.[1] At the same time, as we

1. The conspiracy charged in the indictment extended from June, 1971 to February 15, 1973.

The district judge instructed the jury that if it found separate conspiracies in 1971, 1972 and

have recently noted in United States v. Miley, 513 F.2d 1191, 1207 (1975):

> This, however, does not automatically require reversal. Where the indictment charges one conspiracy but the proof shows more than one, a variance is not necessarily fatal. "The true inquiry . . . is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." Berger v. United States, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935).

Finding no such prejudice, I am compelled to concur. The spill-over claim here is not compelling and did not approach the danger of transference of guilt found persuasive in Kotteakos v. United States, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).[2] See United States v. Miley, supra, 513 F.2d at 1209.

In my view, there is no evidence to support a reasonable inference by a jury that Kurshenoff was engaged in any ongoing venture with Bogan and La Vecchia, the printers and promoters of the bogus bills. It is conceded that he never met any one of the alleged conspirators except for Russo, who, in the summer of 1972, made two sales of counterfeit bills to Kurshenoff in his Manhattan wig emporium, Mr. Esquire.[3] While their total face value was $10,000, Kurshenoff's investment was $1900. Although the court properly charged that a defendant need not know the identity of his fellow conspirators, he must know or have reason to believe that they exist as functioning operatives in a continuing criminal enterprise—else how can he be said to have a stake in and to have adopted the apparatus of their venture?

The judge charged the jury:

> If you find that all the counterfeit bills were printed from plates made from the same negatives that were found in 270 Lafayette Street on the night Mr. Bogin [sic] and Mr. La Vecchia were arrested, you can find that it was a single conspiracy.

This, in my view, is error since there is nothing in the record to link Kurshenoff with Bogan and La Vecchia. Although the bills he bought in fact originated with the principal malefactors, how did the Government establish any nexus of intentional complicity between them and Kurshenoff? The majority here urges that, since Kurshenoff bought two large quantities of counterfeit bills on two separate occasions from Russo, negotiated the sale price in terms of points, and was advised by Russo prior to the second sale that he had more to sell, there were sufficient facts to alert Kurshenoff that others were supplying Russo. None of these facts, singly or in the aggregate, is probative of such knowledge.

I think that the basic error here is equating the sale of counterfeit money with illegal drug trafficking. In numerous cases, this court has described the typical functioning of the drug chain conspiracy—the progressive steps of importation of raw drugs, adulteration, packaging, wholesaling and eventual

---

1973, then "transactions and statements in 1971 and 1973 could not be used against Mr. Andriotis and Mr. Kurshenoff in connection with the sales to them that were alleged to have been made in the summer of 1972." The concern of this opinion is not with the time of the conspiracy but rather with the alleged link between Kurshenoff and Bogan and La Vecchia.

2. The recognition that admission at a trial of several defendants of evidence of another conspiracy with which a particular defendant is not associated is inimical to his interests is not new. In 1603, in the treason trial of Sir Walter Raleigh, Sir Edward Coke reminded the jury that two conspiracies against the King had been discovered. Raleigh interrupted, addressing the jury: "I pray you, Gentlemen, remember that I am not charged with . . . the treason of the priests." Coke responded that all these treasons, "like Sampson's foxes, were joined together at the tails, though their heads were severed." C. Bowen, The Lion and the Throne 193 (1957). The origin of the term "spoke" conspiracy?

3. Since the actual sales occurred in Manhattan, in the Southern District of New York, Kurshenoff was not charged with any substantive crime in the Eastern District.

street retailing. In these cases, the very size of the sales and the circumstances of distribution at various levels were persuasive of the existence of a continuing chain conspiracy and the knowing participation of the actors at each level in the ongoing venture. See United States v. Miley, *supra,* at 1206–1207; United States v. Tramunti 513 F.2d 1087, 1105–1107 (2d Cir. 1975); United States v. Sperling, 506 F.2d 1323, 1340 (2d Cir. 1974); United States v. Mallah, 503 F.2d 971, 983–84 (2d Cir. 1974); United States v. Arroyo, 494 F.2d 1316 (2d Cir.), cert. denied, 419 U.S. 827, 95 S.Ct. 46, 42 L.Ed.2d 51 (1974); United States v. Bynum, 485 F.2d 490, 495–97 (2d Cir. 1973), vacated and remanded on other grounds, 417 U.S. 903, 94 S.Ct. 2598, 41 L.Ed.2d 209 (1974). In my view, the same considerations are not necessarily present in the counterfeiting venture before us. A few plates and negatives here alone could furnish phony ten dollar bills on a continuing basis. The size of a purchase of this type is not indicative of an organization assuring a steady supply but simply of equipment in a back room turned on to meet the demands of customers. Kurshenoff could not reasonably have supposed that he was the only customer; but why he should have imagined that others in a top echelon above Russo were also involved is not clear to me.

The fact that he bought the bills at a discount does not establish anything more sinister than the transactions themselves. Even a purveyor of perukes would understand that bogus bills are not to be purchased at face value. Although Russo called Kurshenoff after he received a second shipment from McMillan, there is nothing in the transcript to indicate that he had mentioned receiving it from a third party. His testimony was:

And then the second time—I believe I called up Herbie and told him I had some more and I was coming over with some.

The Government argues that since Russo was practically illiterate—he had the reading skills of a third grade student—Kurshenoff should have known that Russo did not make the money himself. This is a *non sequitur.* The printing of counterfeit money is hardly a vocation which demands a classical education as a prerequisite. A counterfeiter is not an author but a copier, and presumably he could duplicate bills in any foreign currency without being polylingual.[4]

A principal reason for this separate opinion is that this court has recently said on two separate occasions involving drug conspiracies that it has become all too common for the Government to bring indictments against numerous defendants on the claim of a single conspiracy when the criminal acts could more reasonably and sensibly be regarded as two or more conspiracies. See United States v. Miley, *supra,* 513 F.2d at 1207 at n. 10; United States v. Sperling, *supra,* 506 F.2d at 1340–41. The drug cases are applied here to a counterfeiting case, which, as we have pointed out, is a distinguishable criminal undertaking. Since it is easier to prove a single drug conspiracy than it is to show a single conspiracy for other criminal purposes, our warnings to the Government become especially relevant in a case like this one.

In sum, I do not think that the evidence in this case was sufficient to show any connection between Kurshenoff and the criminal enterprise run by the principal malefactors, nor do I believe that anything in Kurshenoff's dealings with Russo would justify this court in finding that Kurshenoff must have known of a criminal participation beyond that of

---

4. Strangely enough, Russo was a licensed real estate salesman. He testified that he managed to obtain his license without being able to read the questions on the examination, by guessing at the answers to multiple choice questions. This suggests either that Russo possesses exceptional extrasensory perception, or that the examination techniques employed need to be tightened and the proctoring process reviewed. Russo's ability to count is unchallenged.

Russo. While Kurshenoff was no stranger to the spurious in his regular calling, there is no showing of expertise on his part in the product extension attempted. However, I can find no prejudice to Kurshenoff so serious as to require the reversal of his conviction.